Stanford N. WEBSTER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 90–CF–905, 92–CO–84.

District of Columbia Court of Appeals.

Argued Jan. 7, 1993.
Decided April 30, 1993.

of damages. *See supra* note 5 and accompanying text.

Paul L. Knight, Washington, DC, appointed by this court, for appellant.

Barbara A. Grewe, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

Stanford N. Webster was convicted by a jury of unlawful distribution of cocaine, in violation of D.C.Code § 33–541(a) (1988). With the assistance of a new attorney, he filed a motion for a new trial pursuant to D.C.Code § 23–110 (1989), alleging ineffective assistance of trial counsel. The trial judge denied the motion without a hearing. In these consolidated appeals from his conviction and from the order denying his § 23–110 motion, he renews his claim of ineffective assistance. Assuming without deciding that his trial attorney's performance, primarily in attempting to present a misidentification defense, was constitutionally deficient—the first prong of the now familiar test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)—Webster has failed to demonstrate that he was prejudiced as that term is used in *Strickland's* "second prong." Accordingly, we affirm.

## I.

## THE EVIDENCE

Officer Michael Quander, a four-year veteran of the Metropolitan Police Department, testified at trial that on December 6, 1989, at about 1:00 a.m., he purchased a packet of what proved to be cocaine from two men, one of whom was later identified as Webster. According to Quander, Webster approached him at Tenth and I Streets, N.E., a corner which is located in a neighborhood known for drug sales. Quander asked Webster if he was "working." Apparently understanding Quander's inquiry to relate to drugs, Webster approached a second man, to whom we will refer as the "holder,"[1] and spoke with him briefly. Officer Quander noticed that Webster had a foreign accent.

Quander testified that the holder then produced a pack of Kool cigarettes and

---

1. The prosecution presented the evidence of an expert witness who described the roles of the participants in a two-person drug selling operation. The "runner" or "juggler," according to the expert, solicits customers; this was the role allegedly played by Webster. The "holder" maintains access and control over the drugs and sometimes the money; this was the role said to have been played by the second individual.

extracted from it a safety pin with several ziplock bags containing an off-white substance. The holder then handed one of the bags to Webster, who took it to Officer Quander. Quander gave Webster a twenty-dollar bill, the serial number of which he had previously recorded. The entire transaction lasted approximately one minute. Officer Quander stated that he was no more than three feet from Webster while the purchase was being effected. He also asserted that his observation was aided by the presence in the area of high-intensity street lights.

Officer Quander left the scene and broadcast descriptions of the two suspects to the "arrest team." He described the man who first contacted him as being a black male, 5′7″ tall, approximately 180 pounds, medium to dark complexion, with facial hair, a "Jherri-curl style haircut," [2] who was wearing a black leather jacket with fur around the collar and a pair of black pants with burgundy and gray stripes. Officer Quander also testified that it was his practice to focus on a seller's facial features.

Initially, when the members of the arrest team arrived on the scene, they were unable to locate either suspect. Fifteen minutes after the broadcast, however, Officer Kirk Delpo observed a man matching the broadcast description of the "juggler" at the corner of Tenth and K Streets, a block north of the site of the buy. Officer Delpo detained the man and informed Officer Quander by radio that he had done so. Officer Quander drove by at a slow rate of speed in an unmarked police vehicle and positively identified the detained man as the person who had led him to the holder and who had handed him (Quander) the cocaine. The officers then arrested the suspect, who turned out to be Stanford Webster. Webster had no drugs or money in his possession. The holder in the alleged transaction was never apprehended.

Testifying on his own behalf, Webster denied that he had participated in a drug sale. He stated that he had spent the evening at a rooming house at 912 Ninth Street, N.E., the home of the mother of one of his friends.[3] Webster testified that he left the rooming house shortly after midnight[4] to retrieve a ring which he had borrowed from Mary Young, one of the women who was in the group at the boarding house. Ms. Young apparently wanted the ring returned to her because a male friend had noticed that she was not wearing it. Webster walked first to his own house at 1225 Linden Street, N.E. (where, he said, the ring was located, but where a fuse had blown, so that he was unable to look for the ring) and then to 623 Twelfth Street, N.E., the residence of a former girlfriend who, however, was not at home.[5] Webster then walked back towards the rooming house but, on the basis of a professed "religious belief" that he should not retrace his steps,[6] he proceeded north on Tenth Street to K Street, rather than turning west on I Street, the latter being the shortest route to the boarding house on what, as Webster conceded, was a cold December night.

In the area of Tenth and K Streets, Webster observed what he recognized as an unmarked police car. Nevertheless, he "decided that I'm still going to walk. Why be nervous over something I had not

---

2. According to Officer Quander, a Jherri curl is "like a perm almost. It curls your hair. It's sort of oily like, curly and oily."

3. This block of Ninth Street is located between I Street and K Street, a block west and slightly north of the location of the sale, and a block west and slightly south of the corner where Webster was arrested.

4. On direct examination, Webster stated that he left the rooming house between midnight and 12:15 a.m. On cross-examination, he testified that he departed at about 12:30 a.m.

5. Both of these addresses are several blocks to the southeast of the area of the rooming house, the location of the sale, and the corner where Webster was arrested.

6. THE WITNESS: Any time I walk, I don't retrace where I walk.
Q. Why?
A. That's most of the time. I just have that religious belief. I don't backtrack through nothing that I walk.
THE COURT: That's a religious belief?
THE WITNESS: No, but you know.

done?" Shortly thereafter, he was arrested by Officer Delpo.

Webster acknowledged that, at the time of his arrest, he was wearing a black leather coat with fur around the collar and that he matched the broadcast description in a number of respects. He also testified that he was from Panama and that he spoke with an accent. He claimed, however, that twenty-five percent of the residents of his immediate neighborhood speak with an accent "a little" similar to his own.

Several residents of the rooming house confirmed that Webster was at that location until some time after midnight. They also testified that he had a good reputation in the community for telling the truth. One of the witnesses, Mary Young, confirmed that she had lent Webster a ring, but disclaimed any sense of urgency about its return; Webster, on the other hand, testified that he left because Ms. Young needed the ring that night. No witness provided an alibi for Webster for 1:00 a.m., the approximate time of the sale.

Following closing argument and the court's instructions, the jury returned a verdict of guilty as charged. Represented by new counsel, Webster collaterally attacked his conviction pursuant to D.C.Code § 23–110 (1989). On January 13, 1992, the trial judge denied the motion without a hearing "for the reasons stated in the government's opposition." Webster's timely appeals from his conviction and from the order denying his § 23–110 motion were consolidated by this court.

## II.

### THE CONTENTIONS OF THE PARTIES

Webster's principal contention in his § 23–110 motion and on appeal is that his trial counsel failed to present any coherent misidentification defense. He claims that his attorney did not outline or identify such a defense in his opening statement, in his cross-examination of Officer Quander, or in his closing argument. He points out that his counsel did not request a jury instruction on misidentification, nor did he attempt to explain to the jury the infirmities of eyewitness identification, either generally or in the circumstances of the present case, in which, according to Webster, Quander's opportunity to view not one suspect but two was very brief, and the situation, like any night-time undercover buy, was extremely stressful. Webster also complains that his trial counsel failed to focus on the prosecution's obligation to prove Webster's guilt beyond a reasonable doubt.[7] At the very least, says Webster, the trial judge should have held a hearing to determine whether counsel's allegedly deficient actions and omissions were the result of inexperience or incompetence, rather than tactical decisions gone awry.

The government responds that trial counsel's performance was not deficient and that, in any event, Webster has not shown it to be reasonably probable that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068. According to the government, portions of counsel's opening statement,[8] cross-examination,[9] and closing

---

7. Webster's attorney made at best a perfunctory argument in regard to the presumption of innocence and the government's burden in a criminal case. The government contends that the judge instructed the jury on these issues and that there was no need for counsel to do the same. Defense counsel's responsibility in attempting to persuade the jury that a reasonable doubt exists, however, is quite different from the judge's function of providing an impartial articulation of the applicable principles. In the District of Columbia, the judge ordinarily reads the standardized "redbook" instruction. Experienced criminal defense lawyers know that it is the advocate's job to make the presumption of innocence and the government's burden come alive in the context of the facts at hand.

8. The government points out, for example, that trial counsel told the jury that his client was presumed innocent, that he lived in the area, that he had a legitimate reason to be there, and that he was just "in the wrong place at the wrong time." From this, the government claims, the only inference which the jury could reasonably draw was that defense counsel was claiming misidentification. Webster responds in his reply brief that "if the jury had to *infer* what the defense might be, the opening statement was woefully inadequate." (Emphasis added.)

9. The government argues that, on cross-examination, Webster's attorney challenged Quander's

argument [10] demonstrate that he did articulate a defense of innocent presence and misidentification, albeit somewhat obliquely. With respect to counsel's failure to request an identification instruction, the government argues that if the applicable "redbook" instruction had been given, the jury's attention would have been directed to a number of issues, most of which would have redounded significantly to the advantage of the prosecution.[11] Finally, the government argues that the judge did not abuse his discretion, *see Sykes v. United States*, 585 A.2d 1335, 1340 (D.C.1991), in declining to hold a hearing, because it was evident from the trial record that Webster did not suffer prejudice in the *Strickland* sense. Moreover, Webster's contentions, according to the government, were not based on acts or omissions outside the courtroom (*e.g.* failure to interview witnesses), so that no separate evidentiary record was required.

ability to recall by interrogating him on the number of arrests he had made that night. The government also contends that if trial counsel had asked some of the questions which appellate counsel now says should have been asked, the answers might well have been unfavorable to Webster. Nevertheless, the cross-examination was, at best, less than overwhelming.

**10.** The government vigorously defends trial counsel's closing argument:

Counsel stressed in his closing argument the testimony of his witnesses, thereby reiterating appellant's innocent presence and misidentification defenses. He argued that the evidence showed that appellant was a truthful person and that he had provided an innocent explanation for his presence near the crime scene that night. Counsel then suggested that Officer Quander had made a mistake in identifying appellant as the drug seller and supported his argument by pointing out that the officer had altered the seller's description on his buy report. He reminded the jury that the government's case lacked 'physical evidence' (*i.e.*, appellant had no drugs or money when arrested and the zip-lock bag was not fingerprinted) and argued on this basis both that the 'prosecutor has not met his burden' and that the jurors should have a 'reasonable doubt' as to appellant's guilt. Officer Quander, he told them again, 'made a mistake.' (Citations to record omitted.)

**11.** Criminal Jury Instructions for the District of Columbia, No. 5.06 (3d ed. 1978), invites the jury to consider one or more of the following:

## III.

## TRIAL COUNSEL AND THE MISIDENTIFICATION DEFENSE

■ Under the two-prong test enunciated by the Supreme Court, Webster must first demonstrate that his trial counsel's performance was deficient—that he "made errors so serious that he was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra*, 466 U.S. at 687–89, 104 S.Ct. at 2064–65. If he is able to make this showing, then he must next establish that he was prejudiced. To do so, he must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to under-

1. The witness's opportunity to observe the criminal acts and the person committing them, including the length of the encounter, *the distance between the various parties, the lighting conditions at the time, the witness's state of mind at the time of the offense,* and other circumstances affecting the witness's opportunity to observe the person committing the offense that you deem relevant;

2. Any *subsequent identification, failure to identify or misidentification by the witness,* the circumstances surrounding that identification, *the certainty or lack of certainty expressed by the witness, the state of mind of the witness at the time,* and the circumstances bearing on the reliability of the witness's identification that you deem relevant; and

3. Any other direct or circumstantial evidence which may identify the person who committed the offense charge or corroborate or negate the identification by the witness. (Emphasis added.)

The government argues that, taken as a whole, this instruction would not have been helpful to Webster. We are inclined to agree that recitation by the judge of at least the emphasized portions of the instruction, and perhaps of other portions, would have tended to focus the jury's attention on aspects of the case favorable to the prosecution. At the very least, a competent defense attorney could reasonably entertain some doubt as to whether, on this particular factual record, this instruction would advance the client's cause.

mine confidence in the outcome." *Id.* The court may address the two *Strickland* prongs in any order, and need not consider the "deficiency" prong at all if the defendant has not made the requisite showing of prejudice. *Id.* at 697, 104 S.Ct. at 2069.

█ Assuming, without deciding, that Webster has demonstrated that his trial attorney's performance was constitutionally deficient, we agree with the government that his case falters on the "prejudice" prong. In order to prevail, Webster must show that there is a reasonable probability that a different outcome would have been reached if he had been represented at trial by a lawyer who was constitutionally adequate under the deferential *Strickland* standard.[12] Put another way, the question is whether the incremental skills of an attorney who passed constitutional muster would probably have changed the result in this case.

█ In a close case, a showing of reasonable probability is not an unduly exacting one. "[T]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068; *see also Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992). The concept of reasonable probability does require Webster to show, however, that there is a fair prospect that with a constitutionally adequate attorney, the result would have been different.

In the present case, in our view, no such showing has been made. Given the match between the lookout broadcast by Officer Quander and Webster's appearance at the time of his apprehension, the notion that Quander misidentified Webster would have to rest on an improbable coincidence. If such a misidentification occurred, then

someone with an array of similarities to Webster in appearance, clothing, and speech must have been selling cocaine only a block from the corner where Webster was walking a short time later. If the juggler was not Webster, he must have been Webster's virtual clone. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C.1992).

As noted in our narrative of the evidence, Officer Quander's description of the suspect who led him to the holder was quite detailed. The juggler, in other words, did not look like just about anybody else. *Cf. Brown v. United States,* 590 A.2d 1008, 1017 (D.C.1991). Where a description of a suspect is as distinctive as the one in this case, and where the arrested person matches that description in so many respects, the chances that someone other than the suspect committed the offense are necessarily somewhat remote.

We begin with the suspect's speech. Officer Quander noted in his buy report that the individual in question "talks with an accent." Webster is from Panama, and it is undisputed that he speaks with an accent.[13] Standing alone, the fact that both the suspect and Webster speak with an accent would not be conclusive, but one would have to attribute it at least to a mild coincidence.

Officer Quander described the suspect as having a "Jherri Curl" style haircut. It is undisputed that Webster had such a haircut. If the suspect and Webster were not the same man, then by coincidence they shared both an accent and a hairstyle.

Officer Quander described the suspect as wearing a black leather coat with fur around the collar. Webster acknowledged that he was wearing such a coat. Coats

---

12. This standard is not an exacting one. *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. at 2065 (judicial scrutiny of counsel's performance is deferential). *Carter v. United States,* 475 A.2d 1118, 1123 (D.C.1984) ("the right to effective assistance of counsel does not mandate a performance which is completely free of error").

13. Webster testified that in his neighborhood, about twenty-five percent of the residents speak with an accent somewhat similar to his own. He later modified that estimate, attributing such an accent to "four or five" people whom he knew in the neighborhood.

come in many styles and colors, and this match in dress further reduced the probability that the suspect and Webster were two different men.

We now turn to Webster's distinctive trousers. Although there are some discrepancies between Officer Quander's description of the suspect's slacks and Webster's description of his own,[14] it is undisputed that both the suspect and Webster had dark slacks containing the color burgundy, as well as a stripe down the side. The odds against two different men with an accent, a distinctive hairstyle, a specific type of jacket, and dark striped pants containing the color burgundy walking about in the same immediate location are surely substantial, especially in the middle of the night when the streets are relatively empty.

Moreover, these were not the only similarities between the suspect as described and Webster as apprehended. Officer Quander described the suspect as 5'7"; Webster acknowledged that this is his height. Quander estimated the suspect's weight as about 170 pounds; Webster claimed to weigh 180 pounds. Quander

observed facial hair; Webster had facial hair. Quander described the suspect as being in his late twenties; Webster was twenty-four.

Finally, Officer Quander testified that he focused on the suspect's face because facial features do not change. Quander's job as an undercover officer was to remember the two suspects so that he could recognize them if they were apprehended. He positively identified Webster no more than half an hour after the sale. In the final analysis, given the positiveness of the identification by an undercover officer whose precise mission was to prepare to identify any suspects, the striking similarities between the detailed radio run description and Webster's actual appearance, and the weaknesses in the defense case, the likelihood of convincing a jury that a mistake in identity was made was surely slim.[15]

Webster argues that Officer Quander's identification was "uncorroborated," but that is true only in the narrowest sense of that word. The match between the detailed description of the suspect prepared by Quander prior to Webster's arrest[16] and

---

**14.** According to Quander, the suspect wore black pants with burgundy and gray stripes. Webster said he was wearing "burgundy slacks with brown stripes down."

**15.** Webster argues, with some force, that eyewitness identification is often unreliable and that it was his lawyer's job to explain its pitfalls to the jury. In the words of Justice Frankfurter,

> [t]he identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.

FELIX FRANKFURTER, THE CASE OF SACCO AND VANZETTI (1927), quoted in *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967). Indeed, "[p]ositive identification of a person not previously known to the witness is perhaps the most fearful testimony known to the law of evidence." *Wehrle v. Brooks*, 269 F.Supp. 785, 792 (W.D.N.C.1966), aff'd, 379 F.2d 288 (4th Cir.1967). Even if the witness professes certainty, "it is well recognized that the most positive eyewitness is not necessarily the most reliable." *Crawley v. United States*, 320 A.2d 309, 312 (D.C.1974). Some studies have shown a negative correlation between professed certainty and accuracy, and "positive" has been defined as "mistaken at the top of one's voice."

*See In re Dwayne W.*, 109 Daily Wash.L.Rptr. 1901, 1906 (Super.Ct.D.C.1981) (citations omitted).

In the present case, however, the witness was not a surprised victim of an armed robbery who may have been undergoing the most harrowing experience of his life, and who had no prior warning that he would be expected to recall and later recount the details of his assailant's appearance. As the Supreme Court pointed out in *Manson v. Brathwaite*, 432 U.S. 98, 114–15, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), an undercover officer is not

> a casual or passing observer, as is so often the case with eyewitness identification.... [A]s a specially trained, assigned and experienced officer, [Quander] could be expected to pay scrupulous attention to detail, for he knew that subsequently he would have to find and arrest his vendor. In addition, he knew that his claimed observations would be subject later to close scrutiny and examination at any trial.

**16.** Although he contended in his § 23–110 motion in the trial court that he did not precisely match Officer Quander's description, Webster now argues that the description was so detailed that Quander may have filled out his "buy report" after Webster was apprehended. There is no evidence to support this contention, and

Webster's actual appearance provides powerful reassurance that the officers arrested the right man. It is true, as Webster points out, that the twenty-dollar bill with the pre-recorded serial number was never recovered, and that the serial number was pre-recorded in the hope of recovering the money from the defendant and thus enhancing the prosecution's proof. Although, all other things being equal, the government's case is stronger if police find pre-recorded funds on the defendant's person than if they do not, the nature of the transaction in this case made recovery of the twenty dollar bill from Webster most unlikely. Webster was the "runner" or "juggler;" it was the other man who held the drugs and, presumably, got the money.

In the final analysis, it is most unlikely that someone other than Webster (but who looked, dressed and talked like Webster) helped to sell Officer Quander cocaine a block from the corner where Webster was arrested half an hour later. Accordingly, Webster has not shown it to be reasonably probable that a constitutionally adequate attorney would have secured a more favorable result at trial.

## IV.

### TRIAL COUNSEL'S OTHER ALLEGED ERRORS

Webster makes a number of other complaints against his trial attorney. All of

them fail for the same reason that his principal contention fails; given the match between the suspect's description and Webster's appearance, these alleged errors would not have affected the result. We have considered each of Webster's arguments [17] and comment briefly on three of them.

### A. Alibi Defense.

■ Webster claims that his counsel was ineffective in failing to present an alibi defense or to request an instruction on alibi. None of the defense witnesses, however, claimed to know where Webster was at the time of the sale; he had left the boarding house earlier. Although it might perhaps be inferred from Webster's own testimony that he was en route to his own house at the time, the site of the sale was not out of his way. Moreover, as we have noted above, Webster's estimates of the time were quite "soft."

Assuming, *arguendo*, that Webster's own testimony suggested the possibility of an alibi and could be stretched to provide the basis for an alibi instruction [18]—and this assumption is questionable—trial counsel was not constitutionally ineffective in failing to try to stretch the record that far. Moreover, the jurors were instructed that the prosecution must prove Webster's guilt beyond a reasonable doubt, and it is diffi-

---

Quander expressly denied it. Moreover, the description on the buy report is quite similar to the broadcast lookout as described both by Officer Quander and by Officer Delpo of the arrest team. The lookout was obviously sufficiently specific to induce the arrest team to stop Webster. While it is theoretically conceivable that police picked up just anybody, and that they worked backwards and concocted a description, after the fact, which was based on his actual appearance, an impartial trier of fact can hardly find this scenario to be reasonably probable.

Webster also points out that Officer Quander's description on the buy report of the suspect's coat as being black appears to be written over· some other color. Officer Quander testified that he did not know what was written before, but that "[i]t seems to me I was trying to make my letters clearer." One has to strain fairly hard to attribute sinister significance to this possible "write-over" with no more evidence than the present record reflects.

**17.** Substantially for the reasons stated by the government, and because of the strength of the prosecution's case, we do not think that reversal is required because Webster's trial counsel

(1) failed to obtain an expert witness to analyze Officer Quander's alleged writing the word "black" over some other word on his buy report;

(2) failed to object when the prosecutor asked that the record show that Officer Quander had "correctly" identified Webster in the courtroom; and

(3) requested that the court read to the jury the "redbook" instruction with respect to the defendant as a witness.

**18.** "[I]f he or she was not at the exact scene of the crime, the defendant has an alibi." *Gethers v. United States,* 556 A.2d 201, 203 (D.C.1989) (quoting *Gray v. United States,* 549 A.2d 347, 349 (D.C.1988)); *see also Henderson v. United States,* 619 A.2d 16, 19 (D.C.1992); *Fay v. United States,* 22 F.2d 740, 742 (9th Cir.1927).

cult to discern, on these facts, how the plot would have been advanced by an additional instruction that the government must prove that Webster was on the scene when he sold cocaine to Officer Quander.

### B. Redaction.

██ The DEA–7 chemist's report was admitted in evidence. It contained a brief written summary of the incident leading to the recovery of the drugs. Describing this summary as "a neat condensation of the government's whole case against the defendant," *see United States v. Ware*, 247 F.2d 698, 700 (7th Cir.1957), Webster quite reasonably faults trial counsel for not moving to redact from the report a hearsay description of the buy.

The government points out, however, that the summary of which Webster now complains reads as follows:

[illegible] 12–6–89 Wednesday at approx [illegible] officer purchased the above listed item from the above listed location from the above named defendant the [illegible] placed [illegible] 221 [illegible].

Whatever this condensation may have condensed, it was not the weapon of choice in the prosecution's arsenal, namely, the match between the suspect described by Quander and the appearance and speech of Webster when arrested by Delpo. The jurors knew from the testimony that police arrested Webster because they claimed that he participated in the sale. The material of which Webster complains added nothing to their knowledge, and therefore did Webster no damage.

### C. Instruction On Intent.

██ The trial judge instructed the jury that distribution of cocaine is a "general intent" crime. Webster contends that his attorney was ineffective for not objecting to the instruction.

The instruction was correct; only a general intent is required for the offense of distribution. *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir.1988); *State v. Kidder*, 302 A.2d 320, 321 (Me.1973); Criminal Jury Instructions for the District of Columbia, No. 4.33 (3d ed. 1978). Pos-

session of cocaine with intent to distribute it (PWID) requires a specific intent, *United States v. Cebian*, 774 F.2d 446, 447 (11th Cir.1985); Criminal Jury Instructions for the District of Columbia, No. 4.32 (3d ed. 1978), but Webster was not charged with PWID. Accordingly, trial counsel was not ineffective because he failed to object, and Webster was not prejudiced.

### V.

### NEED FOR A HEARING

██ D.C.Code § 23–110(c) (1989) provides that "[u]nless the motion and files and records conclusively show that the prisoner is entitled to no relief," the judge must grant a "prompt hearing thereon." Where the court is faced with a claim of ineffective assistance of counsel, the quoted language creates a presumption that a hearing should be held. *Bruce v. United States*, 617 A.2d 986, 995 (D.C.1992); *Gibson v. United States*, 388 A.2d 1214, 1216 (D.C.1978) (per curiam). This is especially true where the allegations of ineffectiveness relate to facts outside the trial record. *Sykes, supra*, 585 A.2d at 1339.

In the final analysis, however, the question whether a hearing is required is confided to the sound discretion of the trial court,

for the trial judge, who has seen the defense attorney in action and watched the evidence unfold, is in a far better situation than an appellate court to determine whether there is any appreciable possibility that a hearing could establish either constitutionally defective representation or prejudice to the defendant in the *Strickland* sense.

*Id.* at 1340.

██ In the present case, the trial judge's order denying the motion without a hearing was quite perfunctory, and we are less inclined than we would otherwise be to approach his decision deferentially. Nevertheless, we agree with him that a hearing is unnecessary. Our decision is based on the assumption, *arguendo*, that trial counsel's performance was deficient. The only issue is whether Webster was prejudiced.

The alleged errors by counsel are all reflected in the trial transcript; there is no allegation of omissions dehors the record, such as failure to interview witnesses. Under these circumstances, we do not see how an evidentiary hearing could significantly add to the available information on the question whether it is reasonably probable that, but for trial counsel's errors, Webster would have prevailed. Given the uncanny similarity between the suspect described by Quander and the man seized by the arrest team, we are satisfied that despite the absence of a hearing, the record conclusively shows that Webster is entitled to no relief. *Cf. Bruce, supra,* 617 A.2d at 995–97. Accordingly, no hearing was required.

## VI.

## CONCLUSION

For the foregoing reasons, Webster's conviction in No. 90–CF–905 and the order denying his § 23–110 motion in No. 92–CO–84 must be and each is hereby

*Affirmed.*