**Yusef K. ODEMNS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 03–CF–447.

District of Columbia Court of Appeals.

Argued March 7, 2006.

Decided June 22, 2006.

Cynthia Nordone, appointed by the court, for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese III, Assistant United States Attorney, were on the brief, for appellee.

Before SCHWELB, RUIZ, and GLICKMAN, Associate Judges.

SCHWELB, Associate Judge:

On December 18, 2002, a jury found Yusef K. Odemns guilty of armed robbery, in violation of D.C.Code § 22–2801 (2001), and of several related weapons offenses. On March 6, 2003, Odemns was sentenced to imprisonment for an aggregate term of forty-seven years.

On appeal, Odemns contends that the trial judge erred by admitting into evidence, as a spontaneous exclamation or excited utterance, a police detective's testimony regarding an out-of-court statement made to the detective, in response to his questions, by the victim of a different armed robbery committed by Odemns nine days after the charged offense. Odemns claims that the admission of this testimony contravened the hearsay rule, deprived him of rights protected by the Confrontation Clause of the Sixth Amendment, and violated the "other crimes" doctrine of *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964), and its progeny. The government responds that the detective's hearsay evidence was properly admitted under the excited utterance exception; that Odemns did not preserve his Confrontation Clause rights and has not shown that the judge committed plain er-

ror; and that the challenged evidence was admissible under the "identity" exception to the rule of *Drew.* We conclude that the trial judge abused his discretion by admitting the detective's testimony as an excited utterance or spontaneous exclamation, and we therefore reverse Odemns' conviction without reaching his Confrontation Clause and *Drew* claims.

## I.

## THE EVIDENCE

A. *The Capitol Hill robbery.*

At the time of the robbery that led to Odemns' prosecution, Young Chun Ahn and his family owned and operated the Capitol Hill Valet Cleaners, a dry-cleaning establishment located at 409 East Capitol Street in southeast Washington. On the afternoon of March 18, 2002, Mr. Ahn was working near the back of the store while his nine-year-old daughter, Stella, was doing her homework in the front of the establishment.[1] At about 3:45 p.m., a clean-shaven black man, who stood approximately 5′8″ in height, and who appeared to be about twenty years old, came into the premises through the front door. According to Mr. Ahn, the man was wearing a gray sweatsuit jacket with the hood over his head. He was also wearing dark gloves. Believing that the man, a stranger to Mr. Ahn, might be a customer, Mr. Ahn went to the front of the store. The putative customer, however, turned out to be an armed robber. The man walked around the counter, pointed a black handgun at Mr. Ahn, and demanded money.

Thinking first of his daughter's safety, Mr. Ahn hid Stella behind him. He then opened the cash register and gave the robber its contents, a total of between $200 and $250. Evidently unsatisfied with his haul, the robber demanded more money, but Mr. Ahn replied that he did not have any more. The robber next ordered Mr. Ahn to give him a telephone, and Mr. Ahn handed him the store's cordless phone. The robber extracted the battery from the telephone and left the store with the battery and the stolen cash. Although Mr. Ahn attempted to call 911 and began to chase the robber, the man made his escape.

On April 9, 2002, some three weeks after the robbery, Detective Raymond Stargel of the Metropolitan Police Department (MPD) showed an array containing several photographs to Mr. Ahn and then to Stella. Mr. Ahn and his daughter both positively identified a photograph of appellant Odemns as the man who had robbed Capitol Hill Valet Cleaners on March 18. At trial, Mr. Ahn again positively identified Odemns as the robber. Stella testified at trial, however, that she did not see the robber in the courtroom.

B. *The Georgetown robbery.*

Detective Robert Thompson of the MPD testified at the trial regarding his investigation of an armed robbery of the Georgetown Valet Cleaners, which occurred at about 5:00 p.m., on March 27, 2002, at 1655 Q Street, N.W. in Washington, D.C., and which led to Odemns' arrest. Thompson explained that on that date, he was responding to a radio dispatch informing him of the robbery when he learned that a suspect was being pursued in or near the 1300 block of Riggs Street, N.W. Upon arriving at the scene of the chase, Detective Thompson observed other officers apprehending Odemns, who had been hiding behind some garbage cans. At the time he was captured, Odemns was wearing a gray, long-sleeved, hooded sweatshirt. As

---

1. Mr. Ahn's wife, Okatte Ahn, was preparing lunch at the store at the time of the robbery.

he emerged from his hiding place, Odemns told the officers that, "[y]ou got me. How much did ... she say I got? The bitch probably said I took more."

Detective Thompson testified that Odemns was apprehended within minutes of the reported robbery. The police found latex gloves and two rolls of pennies in one of the garbage cans behind which Odemns had been hiding. Across from Odemns' hiding place in a narrow alley, concealed behind the tire of a car, the police found a black semi-automatic Beretta handgun loaded with twelve rounds of ammunition. The Beretta was on top of a pile of cash.

Following Odemns' detention, Detective Thompson proceeded to the establishment that had been robbed, arriving there at about 6:00 p.m. He spoke with the store clerk, a woman of Asian descent. According to Thompson, the woman appeared "excited," "upset," "shaken," and "afraid." In response to Detective Thompson's questions, which consisted primarily of an inquiry regarding what happened, the clerk stated that she had been in the store alone when a man came in, displayed a handgun, and demanded money. The clerk told Detective Thompson that the man walked behind the counter to a cash register and ordered her to open it. Complying at gunpoint with the robber's commands, the clerk opened the cash register and gave the robber the money that was inside. The woman told the detective that the robber ordered her to open two additional cash registers. The clerk did so, but one register was empty and the other may have contained only a roll of coins.[2]

Detective Thompson further related that, according to the clerk, the robber next demanded that she give him a telephone. The clerk told Detective Thompson that she gave the man the "head portion" (presumably the receiver) of a cordless phone. The robber left the store with the money from the first cash register, a roll of coins, a videotape, and the head portion of the telephone. Thompson testified that the clerk described the robber as a dark-complected black man in his twenties. The clerk told the detective that the man wore a gray hooded sweatshirt and gloves "described as the same type of gloves that doctors wear." Detective Thompson testified that the handgun recovered by the police when Odemns was apprehended was similar to the 9-millimeter Glock handguns carried by MPD officers. Mr. Ahn testified at trial that the weapon that the police recovered from the alley on March 27, when Odemns was arrested, looked like the handgun that the robber had used at Mr. Ahn's store on March 18.[3]

The defense presented no evidence. The jury found Odemns guilty as charged.

## II.

## LEGAL ANALYSIS

Odemns contends, *inter alia,* that Detective Thompson's testimony regarding the account of the March 27 robbery provided to the detective by the clerk at the Georgetown Valley Cleaners was inadmissible hearsay evidence. More specifically, he claims that the prosecution failed to establish that the hearsay exception for spontaneous exclamations or excited utterances was applicable to the clerk's out-of-court

---

2. The trial judge ordered the testimony as to what the third register may have contained be stricken.

3. The prosecution presented additional evidence which is not germane to the issues on appeal, and which we therefore do not describe.

responses to the detective's questions. We agree with Odemns' position.

### A. *Background.*

Detective Thompson testified that the robbery at the Georgetown establishment took place at 5:00 p.m. on March 27, 2002, and that he arrived at the store at "approximately 6:00, almost 6:00." The time that elapsed between the robbery and the detective's interview of the clerk was thus approximately one hour. Thompson testified that he asked the clerk questions because "I had to find out what happened," and that the clerk was "able to respond." The clerk's statement thus consisted of answers to the detective's questions, posed about an hour after the robbery.

The only testimony adduced by the prosecution regarding the declarant's mental state at the time that she gave her account was the following:

Q. When you first met with the complainant can you describe for us the complainant's demeanor and how the complainant was acting?

A. Upset, excited.

Q. Did you observe anything else about her physically in terms of how she was acting?

A. She was shaken; she was afraid.

When the prosecutor sought to question Detective Thompson regarding what the clerk told him, Odemns' attorney promptly objected, stating:

Objection. Hearsay. Foundation is not laid.

The trial judge overruled the objection, and Detective Thompson was permitted to relate the clerk's out-of-court statements.

### B. *Standard of review.*

The government appears to imply, although it does not explicitly say, that we should review the judge's overruling of Odemns' objection only for plain error. According to the government, Odemns' objection "arguably did not raise and preserve the complaint he presents here," namely, that the clerk's statements, as related by Detective Thompson, "were incorrectly admitted as excited utterances." We do not agree that the plain error standard applies.

 Defense counsel made an unequivocal hearsay objection,[4] and Detective Thompson's testimony was obviously hearsay, in that the clerk's out-of-court statements were being introduced by the government to prove the truth of the matters asserted. It was therefore incumbent upon the prosecution to identify an exception to the hearsay rule and to establish that the exception applied. As we recently stated in *In re Ty.B.*, 878 A.2d at 1264–65,

> "[t]he law is clear that the [government] and the trial court, not the . . . appellant, had the legal responsibility to clarify the basis for admitting testimony, over objection, that otherwise was inadmissible hearsay." *Patton v. United States*, 633 A.2d 800, 809 (D.C.1993) (per curiam). Moreover,

> *on proper objection it is clearly the burden of the party seeking its admission, to identify the appropriate exception and to demonstrate that the testimony fell within it.* And it is the trial court's responsibility to examine the testimony and determine whether the proper foundation has been laid

---

4. Counsel's objection that no foundation had been laid, while perhaps not as specific as it might have been, also reasonably alerted the trial court to the defendant's position that the applicability of a hearsay exception had not been established. *See In re Ty.B.*, 878 A.2d 1255, 1265 (D.C.2005).

for the exercise of discretion as to its admission.

*Id.* at 810 (emphasis in *Patton* ) (quoting *In re M.L.H.*, 399 A.2d 556, 558 (D.C. 1979)). In this case as in *M.L.H.*, "the [government] never identified a hearsay exception for the trial court to review." 399 A.2d at 558.

 Because we conclude that the issue has been preserved, we apply the facially somewhat confusing conventional standard of review:

What constitutes a spontaneous utterance depends upon the facts peculiar to each case and such utterance is admitted in the exercise of sound judicial discretion which is not disturbed on appeal unless clearly erroneous. *Beausoliel v. United States,* 71 App. D.C. 111, 113–14, 107 F.2d 292, 294–95 (1939); *Guthrie v. United States,* 92 U.S.App. D.C. 361, 364, 207 F.2d 19, 23 (1953).

*Nicholson v. United States,* 368 A.2d 561, 564 (D.C.1977); *accord, Bryant v. United States,* 859 A.2d 1093, 1106 (D.C.2004); *Reyes–Contreras v. United States,* 719 A.2d 503, 505–06 (D.C.1998). In general, the "abuse of discretion" standard is not identical to the "clearly erroneous" rule; the former deals with a choice between alternatives, and the latter with the review of factual findings. In the present context, we take the court's language to mean that the underlying factual findings are reviewed under the "clearly erroneous" standard and that the decision whether to admit or exclude the proffered statement, based on those factual findings, is reviewed for abuse of discretion.

We now turn to the question whether Odemns has demonstrated that the judge committed reversible error under the foregoing standard.

C. *The hearsay exception for spontaneous exclamations or excited utterances.*

 In the District of Columbia, the elements of the hearsay exception here at issue are:[5]

(1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark. *See generally* McCormick, Evidence § 297 (2d ed.1972).

*Nicholson,* 368 A.2d at 564; *accord, Alston v. United States,* 462 A.2d 1122, 1126–27 (D.C.1983); *Reyes–Contreras,* 719 A.2d at 506; *Bryant,* 859 A.2d at 1106. "The deci-

---

**5.** What's in a name? That which we call a rose

By any other name would smell as sweet. William Shakespeare, Romeo and Juliet, Act II, Sc. 2. The hearsay exception now relied upon by the government was formerly embraced in the somewhat imprecise concept of the *res gestae.* "The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as 'res gestae.' " Edmund Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229, 229 (1922) (quoted in Edward W. Cleary, McCormick on Evidence § 288, at 836 n. 6 (3d ed.1984)).

In more recent times, the Latin phrase has come into disuse, and the terms "excited utterance" and "spontaneous exclamation," or some variation of these words, have been used somewhat interchangeably. We think it fair to say, in light of the authorities cited in the text, *infra,* that the declarant's state of excitement is a necessary element of the exception but that spontaneity is its *raison d'être.*

sive factor in determining admission of declarations relating to a violent crime made by the victim shortly after its occurrence is that circumstances reasonably justify the conclusion *that the remarks were not made under the impetus of reflection.*" *Nicholson,* 368 A.2d at 564 (emphasis added; citations omitted). Stated another way, "[t]he critical factor is that the declaration was made within a reasonably short period of time after the occurrence *so as to assure that the declarant has not reflected upon [her] statement or premeditated or constructed it.*" *Smith v. United States,* 666 A.2d 1216, 1223 (D.C.1995) (emphasis added; citations omitted). Thus, spontaneity and lack of opportunity for reflection constitute the key elements, and before admitting an out-of-court statement under this exception, the judge must be assured, *i.e.,* fully confident, that these requirements have been satisfied.

The government's position in this case appears to be that because the declarant was a victim of a serious crime, and because she was consequently upset, shaken, and afraid, her account, which was provided an hour after the crime and in response to police questioning, was necessarily admissible under the hearsay exception for spontaneous exclamations. We do not agree with this position, for it fails to take into account the critical requirement of spontaneity. Indeed, the government's position takes the exception well beyond its origins and the reasons for its existence. The hearsay rule is designed to protect litigants from judgments based on unreliable second-hand evidence which is not subject to cross-examination, and its proscriptions cannot be avoided by rote recitations that the declarant was upset or excited or afraid.

"[T]o the extent the hearsay exception for spontaneous declarations existed at all [in 1791], it required that the statements be made 'immediately upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage.'" *Crawford v. Washington,* 541 U.S. 36, 58 n. 8, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (quoting *Thompson v. Trevanion,* Skin. 402, 90 Eng. Rep. 179 (K.B.1694)). Spontaneous utterances were traditionally admitted only if they were "made in the transaction ... or while it was pending." *Packet Co. v. Clough,* 20 Wall. 528, 87 U.S. 528, 542, 22 L.Ed. 406 (1874). The hearsay exception was thus intended to apply to situations in which the declarant was so excited by the precipitating event that he or she was still "under the spell of its effect." *United States v. Edmonds,* 63 F.Supp. 968, 971 (D.D.C. 1946).[6] Although the psychological basis

---

**6.** The court's lucid explanation in *Edmonds* of the hearsay exception for spontaneous exclamations merits quotation at some length:

It is a well recognized psychological phenomenon that a person making an exclamation or a statement while under the influence of the excitement or shock caused by witnessing or participating in an extraordinary event, such as a murder or a serious accident, is unlikely to fabricate an untruth, but, on the contrary, has a tendency to disclose what is actually on his mind. The mental stress and nervous strain preclude deliberation and bar reflection. Declarations made while the spell endures are uncontrolled. *They are practically reflex ac-*

*tions and may be said to be verbal photographs or images of the contents of the brain.* Such utterances are likely to be made without any calculation as to their potential effect and without regard to their possible consequences. They are apt to be the truth as the person knows it. Consequently, it is safe to accept testimony as to expressions of this type, even in the absence of an opportunity to cross-examine the person who gave vent to them. *These considerations form the underlying reason for this exception to the hearsay rule.*

*Id.* (emphasis added). The corollary of the foregoing discussion is that if a statement is made in circumstances in which it is *not*

for the theory justifying the exception has not gone unchallenged,[7] it has become a part of the "warp and woof" of our law, and we do not challenge it here.

Over the years, some of our cases have imported a measure of flexibility into the admissibility calculus of spontaneous exclamations and excited utterances, but the fundamentals of the doctrine have remained intact. In *Alston*, 462 A.2d at 1126, the court, quoting from a leading decision then forty-four years old, stated that:

> declarations, exclamations and remarks made by the victim of a crime after the time of its occurrence are sometimes admissible upon the theory that under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. *Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy.* Beausoliel v. United States, 71 App. D.C. 111, 113, 107 F.2d 292, 294

(1939) (emphasis added; citations and internal quotation marks omitted).

The court in *Alston* then carefully analyzed each of the three elements of a spontaneous or excited utterance as described in *Nicholson*. See p. 10, *supra*. With respect to the first requirement—that there be a serious occurrence which causes a state of nervous excitement or physical shock in the declarant—the court stated that evidence of mental disturbance or physical shock must be presented, but cautioned that "[e]ven if such evidence is presented, if the reaction has ceased during peaceful hours between the event and the utterance, the statement cannot be admitted." 462 A.2d at 1127.

The court then addressed the requirement that the declaration must have been made "within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it." *Id.* (quoting *Nicholson*). The court stated that "[w]hile the time element is not controlling, *it is of great significance.*" *Id.* (emphasis added). "[W]hen the utterance is made immediately ... or a few minutes after the [disturbing] incident, the declarations can properly be accepted under this hearsay exception." *Id.* (citations omitted). Statements made one hour after the incident, on the other hand, are admitted when, and presumably

---

uncontrolled, or when it *cannot* be described as a "verbal photograph or image of the contents of the brain," then the justification for the exception disappears.

**7.** The entire basis for the [excited utterance] exception is, of course, subject to question. While psychologists would probably concede that excitement minimizes the possibility of reflective self-interest influencing the declarant's statements, they have questioned whether this might be outweighed by the distorting effect of shock and excitement upon the declarant's observation and judgment.

2 JOHN W. STRONG, McCORMICK ON EVIDENCE § 272, at 205 (5th ed.1999). *See also* Hutchins & Schlesinger, *Spontaneous Exclamations*, 28 COLUM. L.REV. 432, 437 (1928) ("One need not be a psychologist to distrust an observation made under emotional stress; everybody accepts such statements with mental reservation."). *Jones v. United States*, 829 A.2d 464, 468 (D.C.2003) (per curiam) (concurring opinion) (discussing the foregoing authorities).

only when, "the age and condition of the declarant support spontaneity." *Id.*[8]

■ In the present case, the government's evidence regarding the declarant's state of mind, consisted essentially of the commission of the March 27 armed robbery and Detective Thompson's four adjectives: "upset," "excited," "shaken," and "afraid." Obviously, a person who has just been robbed at gunpoint is unlikely to be in a placid frame of mind. Indeed, it is difficult to imagine a situation in which the adjectives used by the detective would not describe any victim of an armed robbery. But this is hardly a case in which the out-of-court statement was made "immediately upon the hurt received," *Crawford,* 541 U.S. at 58 n. 8, 124 S.Ct. 1354 (quoting *Thompson,* 90 Eng. Rep. 179), or "in the transaction or while it was pending." *Packet Co. v. Clough,* 87 U.S. at 542, or so soon after the robbery that the victim had no opportunity to reflect. *Nicholson,* 368 A.2d at 564. There was no showing that the declarant remained "under the spell of [the robbery's] effect," *Edmonds,* 63 F.Supp. at 971, or that her reflective faculties had been stilled, or her control over them removed. *Beausoliel,* 71 App. D.C. at 113, 107 F.2d at 294; *Alston,* 462 A.2d at 1126 (quoting *Beausoliel* ). There was no evidence that the declarant shrieked out her account, that she had lost her self-control, or that she was unable to think or reflect. Rather, shaken and upset as she undoubtedly was, she gave evidently responsive and rational answers to the detective's questions. We discern no basis in the record for finding, in the declarant's responses to the detective's inquiries, the spontaneity that remains the key to this hearsay exception.

The authorities on which the government relies are distinguishable in dispositive respects. In *United States v. Woodfolk,* 656 A.2d 1145 (D.C.1995), *cert. denied,* 516 U.S. 1183, 116 S.Ct. 1286, 134 L.Ed.2d 231 (1996), for example, the out-of-court declarant called 911 because her boyfriend, who had a gun, would not let her leave the house, and the declarant was afraid that he would hurt her. The tape of the call was in evidence, and the trial judge relied on "the declarant's expressed fear, the [continued] presence of a gun in the house, and the sense of urgency (both in [the declarant's] tone of voice and in her request 'please hurry,')" *id.* at 1151, to conclude that a "startling event occurred and that it was in a state of nervous shock following that event that [the declarant] made the 911 call." *Id.* In the present case, there was no danger from a firearm, or from any source, at the time the clerk was answering the detective's questions. Further, in this case, unlike in *Woodfolk,* the judge had no opportunity to hear the tone of the declarant's voice, and he could not and did not rest his decision on any such evidence.

In *Bryant,* 859 A.2d at 1106, the out-of-court declarant, a kidnap victim who had been repeatedly raped by her captors, made a statement to the police immediately upon her rescue. At the time she made it, she was "crying, shaking, and very distraught." These circumstances differ dramatically from the store clerk's interview by the police an hour after the armed

---

8. In concluding, with respect to the third element, that "the totality of circumstances" surrounding the declarant's statement did not support a finding of spontaneity, the court stated in *Alston* that "the fact that the statements were made in response to a question is not decisive." *Id.* at 1128. The court nevertheless treated the fact that the declarant, a small child, was responding to questions as a factor in the calculus. *See also Teasley v. United States,* 899 A.2d 124, 129 n. 4 (D.C. 2006).

robbery in this case—a robbery in which the clerk had not been injured or harmed.

In its brief, the government also describes *Reyes–Contreras,* 719 A.2d at 505, as "affirming admission of utterance made thirty minutes after event and citing cases affirming admission of utterances after the passage of three hours and of two hours." But *Reyes–Contreras* is also distinguishable from the present case in critical respects, and the purported "three-hour" and "two-hour" cases are even more so. In *Reyes–Contreras,* the declarant, who was bruised, bleeding, crying, yelling, and visibly upset, waved down a police car and told the officer that "he [9] hit me, he hit me." *Id.* In spite of the lapse of half an hour from the time of the assault, we held that her statement was properly admitted because the assault had obviously caused "a state of nervous excitement or physical shock in her," and because "the circumstances of the assault and her search for police directly after the assault suggested the spontaneity and sincerity of [the declarant's] remarks." *Id.* at 506 (citations and internal quotation marks omitted). The declarant in the present case was not bleeding or bruised, she was not crying, yelling, or waving her hands, and the delay was twice as long. The circumstances are therefore not at all comparable.

The "three-hour" case to which the government refers is *Price v. United States,* 545 A.2d 1219 (D.C.1988). In reality, *Price* was not a "three-hour" case at all. As Judge Reilly explained in his opinion for the court,

> [a]ppellant ... contends that the second condition for admissibility as an excited utterance was not satisfied as three hours had elapsed between the time of the shooting and the telephone call. During that interval the witness had

returned home and gone to bed, and therefore, had time to reflect. Hence, appellant contends that whatever she said on the phone could not be viewed as a spontaneous revelation in the context of sudden shock.

This argument overlooks the fact, however, that not until Miss Wilson received the call did she learn that her most recent lover had been severely injured by the gunfire. Although she was aware that the shots had shattered the windows of the car, she might well have thought that the ability of the occupant of the car to start his motor so promptly and to drive out of gun range indicated that he had escaped unscathed. In view of the romantic relationship between witness and victim, the discovery that the latter had been wounded and hospitalized might well have caused her to burst into tears and triggered the words exculpating herself and incriminating her other lover.

> *In short, the record suggests that Miss Wilson's utterance responded to information she learned in the phone call, not to the shooting that had occurred earlier. Consequently, appellant's emphasis on her going to bed after the shooting, thus eliminating spontaneity, is beside the point.*

*Id.* at 1226 (emphasis added). Thus, the event that caused the shock to the declarant did *not* happen three hours before she made her out-of-court statement; rather, the statement was made during the very conversation in which she heard the shocking news. Given the court's reasoning as quoted above, the suggestion that *Price* supports admission of the clerk's statements to Detective Thompson in the present case is not at all persuasive.

---

9. The declarant was referring to her husband.

The "two-hour" case relied upon by the government likewise contains no appreciable resemblance to the present one. In *Harris v. United States*, 373 A.2d 590 (D.C.1977), the decedent, who had been shot, made an incriminating disclosure to the police in the hospital emergency room approximately two hours after the shooting. However, the circumstances were markedly different from those here. The trial judge found that "during the time decedent was in the emergency room he was substantially and predominantly under the influence of the trauma which had been inflicted upon him, and . . . the declarations which he made at the time . . . do qualify as exceptions to the hearsay rule under spontaneous declarations." *Id.* at 593. This court affirmed, noting that the decedent's

> medical condition was critical when he talked to the officer. He was suffering from several gun shot wounds, at least one of which was in his chest and, when he was admitted to the hospital, his blood pressure was zero. There was testimony that he was in a great deal of pain, and that it was an effort for him to talk.

*Id.* It was under these extraordinary circumstances that we held that the deceased declarant's out-of-court statements were receivable in evidence under the hearsay exception for spontaneous exclamations, even though the statements were made two hours after the shooting. No such exceptional circumstances are present in this case.

In sum, none of the authorities relied upon by the government bears in any significant way upon the record presently before us. Although there is no doubt that the declarant in this case was subjected to a frightening armed robbery an hour before she was interviewed, the four adjectives used by Detective Thompson in his description of the clerk's state of mind do not establish, or even significantly address, the element of spontaneity on which the theory of this hearsay exception is based. We recognize that, although the trial judge did not have the opportunity to observe or to hear the declarant, our standard of review is deferential. On this record, however, we conclude that the admission of Detective Thompson's testimony regarding the declarant's out-of-court statements cannot be sustained, for there was no finding of spontaneity and no evidence to support such a finding.

### D. *Harmless error analysis.*

The government contends that even if the trial judge erred in admitting, as an excited utterance or spontaneous exclamation, the clerk's responses to Detective Thompson's questions, any such error was harmless under *Kotteakos*.[10] Because the error on which our reversal of Odemns' conviction is based was a violation of the hearsay rule,[11] we agree with the government that the non-constitutional *Kotteakos* standard applies. Nevertheless, we are constrained to conclude that the error was prejudicial rather than harmless.

In *Kotteakos*, which was decided sixty years ago but remains, to this day, the starting point for any discussion of harmless error, the Court stated:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm

---

10. *Kotteakos v. United States*, 328 U.S. 750, 764–66, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

11. As previously noted, we do not reach Odemns' constitutional claims under the Confrontation Clause.

or a specific command of Congress.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

328 U.S. at 764–65, 66 S.Ct. 1239. In *In re Ty.B.*, 878 A.2d at 1267, we recently had occasion to discuss the *Kotteakos* standard in some detail:

To conclude that an error is harmless, we must find it *"highly probable* that [that] error did not contribute to the verdict." *United States v. Tussa*, 816 F.2d 58, 67 (2d Cir.1987) (emphasis added) (quoting *United States v. Corey*, 566 F.2d 429, 432 (2d Cir.1977)); *Clark* [*v. United States*, 593 A.2d 186, 192 (D.C. 1991)]. "We must determine whether the error was *sufficiently insignificant* to give us *fair assurance* that the judgment was not substantially swayed by it." [*Reginald B.*] *Brooks v. United States*, 599 A.2d 1094, 1102 (D.C.1991) (emphasis added) (citing *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239).... Thus, even where there is sufficient admissible evidence to support the judge's finding, we cannot treat the erroneous admission of hearsay as harmless unless the error was so inconsequential as to provide reasonable assurance that it made no appreciable difference to the outcome.

878 A.2d at 1267 (emphasis in original).

■■■ In this case, the trial court permitted the jury to learn that the defendant, on trial for an armed robbery committed on March 18, 2002, had committed a different, but in some respects similar, armed robbery nine days later. The means by which the jury was apprised of the second robbery was the hearsay testimony of Detective Thompson relating the victim's statement and her answers to his questions. Once the victim had described the March 27 robbery, the jury learned that Odemns had in effect confessed to committing it, and that he had been armed with a handgun similar or identical to the one used in the charged crime.[12] Without the clerk's out-of-court statements to the detectives, there would have been no predicate or foundation for the admission of Odemns' confession. Under these circumstances, we do not think it "highly probable," *In re Ty.B.*, 878 A.2d at 1267, that the error made no appreciable difference to the outcome, for "the danger posed by evidence of prior criminal conduct to the defendant's right to a fair trial is substantial." *Thompson v. United States*, 546 A.2d 414, 419 (D.C.1988).

■■■ "[O]nce evidence of prior crimes [13] reaches the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence." *United States v. Daniels*, 248 U.S.App. D.C. 198, 205, 770 F.2d 1111, 1118 (1985) (citations omitted); *Thompson*, 546 A.2d at 419; *see also People v. Molineux*, 168 N.Y. 264, 61 N.E. 286, 293–94 (1901).[14] The rule barring admission of evidence of other

---

**12.** We agree with the government, however, that the fact that Odemns was in possession of the pistol was properly admissible as bearing on the issue whether he had committed the charged crime. *See, e.g., King v. United States*, 618 A.2d 727, 728–30 (D.C.1993).

**13.** Or, as in this case, of a new crime committed nine days after the original offense.

**14.** In *Molineux*, the New York Court of Appeals explained the reasons for barring the admission of uncharged crimes to show the defendant's propensity for criminal conduct: This [propensity] rule, so universally recognized and so firmly established in all English-speaking lands, is rooted in that jealous regard for the liberty of the individual which has distinguished our jurisprudence from all others, at least from the birth of

crimes to prove criminal propensity is "thought to be indispensable to the presumption of innocence," and it has "constitutional overtones." *Thompson,* 546 A.2d at 419 (*citing, inter alia, Molineux* and McCormick On Evidence § 190, at 557 n. 1 (1984 ed.)). As we suggested in *Thompson,*

> "to tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities." *United States v. Daniels,* 248 U.S.App. D.C. [at 205], 770 F.2d [at 1118]. Put another way, other crimes evidence may "result in casting such an atmosphere of aspersion and disrepute about the defendant as to convince the jury that he is a habitual lawbreaker who should be punished and confined for the good of the community." *Pinkney v. United States,* 124 U.S.App. D.C. 209, 211, 363 F.2d 696, 698 (1966).

*Id.*

Moreover, in this case, the hearsay report of the Georgetown robbery was even more prejudicial than propensity evidence about some different and obviously unrelated crime. That report was admitted under a recognized *Drew*[15] exception because it was thought to be so similar to the charged Capitol Hill robbery that it tended to prove Odemns' identity as the perpetrator of that offense. Thus, if the jurors had reservations about the evidence of the Capitol Hill robbery itself, the hearsay evidence that Odemns committed the Georgetown robbery could well have persuaded them of Odemns' guilt of the charged crime because he committed such a similar one nine days later.

The government argues that the evidence against Odemns was strong, and that any error in admitting the clerk's out-of-court description of the March 27 armed robbery did not significantly affect the verdict. In our view, the prosecution's case, not including the evidence relating to the March 27 robbery, was neither particularly weak nor overwhelming. Two witnesses, both strangers to Odemns, identified him three weeks after the robbery from a photo array; one of them, a twelve-year-old girl, was unable to identify him at trial.[16] In addition, the prosecution introduced evidence from which an impartial jury could readily infer that, nine days after the March 18 robbery, Odemns possessed a pistol similar to the one used in that offense. In any event, we have no doubt

Magna Carta. It is the product of that same humane and enlightened public spirit which, speaking through our common law, has decreed that every person charged with the commission of a crime shall be protected by the presumption of innocence until he has been proven guilty beyond a reasonable doubt.
61 N.E. 293–94; *see also Thompson,* 546 A.2d at 418 (quoting *Molineux* ).

**15.** *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964).

**16.** "The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials." Felix Frankfurter, The Case of Sacco and Vanzetti (1927), quoted in *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Indeed, "[p]ositive identification of a person not previously known to the witness is perhaps the most fearful testimony known to the law of evidence." *Wehrle v. Brooks,* 269 F.Supp. 785, 792 (W.D.N.C.1966), *aff'd,* 379 F.2d 288 (4th Cir.1967). Even if the witness professes certainty, "it is well recognized that the most positive eyewitness is not necessarily the most reliable." *Crawley v. United States,* 320 A.2d 309, 312 (D.C.1974).

*Webster v. United States,* 623 A.2d 1198, 1204 n. 15 (D.C.1993); *see also In re As.H.,* 851 A.2d 456, 459–60 (D.C.2004).

that, if credited, the government's evidence was sufficient to sustain a guilty verdict on the charges against Odemns stemming from the March 18 armed robbery, even without including in the calculus Detective Thompson's testimony regarding the statements made to him by the victim of the March 27 robbery.

■ To paraphrase *In re Ty.B.*, 878 A.2d at 1266, "[i]t may be that the non-hearsay evidence introduced by the [prosecution] would have been sufficient to sustain the [verdict of guilty], but that is not the question before us." "[T]he sufficiency issue is distinct from that of harmless error." *Id.* (quoting *Williams v. Zahradnick,* 632 F.2d 353, 364 (4th Cir.1980)). Accordingly, "analysis under the harmless error doctrine should not be limited to superficial inquiry as to whether the same verdict would have been possible absent the tainted evidence." *Brooks v. United States,* 367 A.2d 1297, 1309 (D.C.1976). The words of this court in *Fox v. United States,* 421 A.2d 9 (D.C.1980) reflect our view of the harmless error issue here:

> We are satisfied that this evidence was sufficient to permit a guilty verdict. We do not, however, find the evidence so strong as to justify a conclusion that the erroneously admitted hearsay testimony was harmless in its impact on the jury deliberations. Whether, absent this item of evidence, a jury would nonetheless convict appellant is a speculation which we are neither prepared nor willing to undertake.

17. We emphasize that our conclusion regarding harmlessness is not intended to resolve the quite different question whether, if evidence of the March 27 robbery is offered at a second trial, it should be admitted under the "identity" exception to the rule excluding other crimes evidence, *see, e.g., Bridges v. United States,* 381 A.2d 1073, 1075 (D.C.1977), or excluded as substantially more prejudicial

*Id.* at 14. Accordingly, we do not find the error harmless.[17]

## III.

## CONCLUSION

For the foregoing reasons, Odemns' convictions are reversed, and the case is remanded to the trial court for a new trial.

*So ordered.*

than probative. *See Johnson v. United States,* 683 A.2d 1087, 1099–1100 (D.C.1996) (en banc), *cert. denied,* 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). This question, if it arises, will be addressed to the sound discretion of the trial court, and since we do not know whether, or in what form, it will be presented, we express no opinion with respect to it.