## III. Conclusion

**In re T.C., Appellant.**

**No. 08–FS–1448.**

District of Columbia Court of Appeals.

Argued May 19, 2010.
Decided July 15, 2010.

Kyle A. McGonigal, Washington, DC, for appellant.

John J. Woykovsky, Assistant Attorney General for the District of Columbia, with

whom Peter J. Nickles, Attorney General, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for the District of Columbia.

Before FERREN, TERRY, and SCHWELB, Senior Judges.

SCHWELB, Senior Judge:

On September 16, 2008, following an evidentiary hearing in the Juvenile Branch of the Family Court, T.C., then aged 17, was found involved in two counts of armed robbery,[1] one count of carrying a pistol without a license (CPWOL),[2] and one count of possession of a firearm during the commission of crime of violence (PFCV).[3] T.C. was found not involved with respect to one count of possession of a prohibited weapon (PPW (b))[4] and one count of unlawful possession of ammunition.[5] T.C. was placed on probation for one year.

On appeal, T.C. claims that the evidence was insufficient as a matter of law to prove that he was the person who committed the charged offenses, that the trial judge's conduct of the evidentiary hearing was not impartial, and that several of the judge's other rulings constituted reversible error. In our view, there was at least one significant discrepancy in the evidence, which T.C.'s counsel and the judge both failed to detect, and which made the question of guilt or innocence somewhat closer than it would otherwise be. In addition, the judge erred in several of her evidentiary rulings, and although we are confident that she did her best to be fair and to discern the truth, she took an unusually active part in the questioning of defense (but not government) witnesses. Under the circumstances, in our view, the judge might appropriately have paid greater attention to preserving the appearance of impartiality. Nevertheless, we discern no reversible error. Accordingly, we affirm.

## I.

## THE TRIAL COURT PROCEEDINGS

At about 10:00 p.m. on July 2, 2008, Vincent Cartwright and Kevin Amato were robbed at gunpoint by two youths who appeared to be in their teens. The robbers took a bank card and keys from Cartwright and three crisp twenty dollar bills from Amato. Amato had obtained the three twenty dollar bills from an Automatic Teller Machine (ATM) a short time before the robbery.

The robbers fled down an alley, and one of the victims called the police on his cell phone. Officers arrived within a few minutes, and the victims provided reasonably detailed descriptions of the two robbers. Soon thereafter, police detained five young men as possible suspects. One of those detained was T.C.

At a show-up conducted approximately twenty-five minutes after the robbery, both Cartwright and Amato positively identified T.C. as one of the youths who had robbed them. Specifically, they stated that he was the gunman, and that the gunman's confederate had been wearing a mask. T.C. had three fresh twenty dollar bills in his possession. No other fruits of the robbery were recovered from T.C. or found in the surrounding area, and the handgun used in the robbery was never found.

---

1. D.C.Code §§ 22–2801, –4502 (2001).

2. D.C.Code § 22–4504 (2001).

3. D.C.Code § 22–4504(b) (2001).

4. D.C.Code § 22–4514(b) (2001).

5. D.C.Code § 7–2506.01.

Three of T.C.'s friends, as well as T.C. himself, testified for the defense. According to the defense witnesses, T.C. was not and could not have been the robber. All four young men stated that they and a number of their friends had been playing basketball for several hours at a nearby school. A short time before they left, they saw two other young men running past the scene. Thereafter, police arrived, and the young men who had been playing basketball scattered in different directions. Essentially, T.C.'s friends claimed to have been in his presence until shortly before his arrest, thus providing the basis for an alibi defense.

T.C.'s father, the Program Manager for Intake at the District's Child and Family Services Administration (CFSA), also testified for the defense. The father stated that on July 1, 2008—the day before the robbery—T.C. had withdrawn $143.00 [6] from his summer youth employment account at the Chevy Chase Bank. The father further asserted that after T.C.'s arrest, he (the father) had found $80.00 in T.C.'s dresser drawer.[7] In response to a question from the court, the father acknowledged that he had not personally observed his son make the withdrawal, but he stated that T.C.'s mother had told him that T.C. had done so. The trial judge immediately sustained her own objection to this testimony as hearsay. T.C. testified in his own behalf, denied any involvement in the robbery, and stated that he had indeed withdrawn approximately $140.00 from an ATM on July 1, and that

he had taken $60.00 with him the following day, leaving the rest of the money in a drawer.

The judge, who had interrogated the young defense witnesses in some detail, did not credit their testimony, and she ruled, *inter alia,* as follows:

> Now the court heard from the respondent's friends, C.S., J.R. and Ronald Wright, and the court also heard from T.C. And if the court were to believe their testimony, the court would have to believe that they were playing basketball from 5:30 until 10:00, that they were wearing jeans, playing basketball with no basketball, in the dark, and played basketball after they smoked marijuana.
>
> Mr. Wright said that they had played basketball for four to five hours, they then smoked marijuana and then played basketball again, which seems unlikely. The testimony is contradicted by Officer Small,[8] who said that there was no basketball, and the court was dark, and that there was no sporting equipment on the scene, and that he had in fact searched the area.
>
> We have two eyewitnesses who identifi[ed] the respondent, based not just on clothing but also his facial features and his hair, his wristbands and that the respondent was stopped in a short time and within a short distance of the robbery, following the same path of flight identified by Mr. Amato and Mr. Cartwright.

6. The defense attempted to introduce an Internet printout from the account showing this withdrawal, but the judge excluded the document as hearsay. T.C.'s attorney did not question the judge's hearsay ruling, and the proposed exhibit apparently was not made a part of the record on appeal.

7. During the course of his own testimony, T.C. confirmed that he had made this with-

drawal, and that on July 2 he had taken $60 with him because he had planned to go shopping for clothes with one of his friends.

8. Officer Ryan Small testified on rebuttal and, as the judge noted, cast some doubt on the defense position that the young men were playing basketball until shortly before T.C.'s arrest.

On this evidence, the court finds beyond a reasonable doubt that the respondent took the property that was of value from the two complaining witnesses, that he did so from their immediate actual possession. That he used force and violence to take their property. That he carried the property away without a right to it with the specific intent to steal it. And that at the time he took the property, he had a weapon.

Presumably as a result of her ruling excluding the bank record, the judge made no mention of the testimony of T.C.'s father or of the defense's innocent explanation of the presence of the three twenty dollar bills in T.C.'s pocket, namely, his claimed ATM withdrawal of the previous day. The judge found T.C. involved in armed robbery, PFCV, and related weapons offenses. On October 21, 2008, the judge placed T.C. on juvenile probation for one year. This appeal followed.

## II.

### EVIDENTIARY SUFFICIENCY

T.C. claims on appeal that the evidence against him was insufficient as a matter of law. We disagree.

■ In assessing claims of evidentiary insufficiency, we view the record in the light most favorable to the District, and we "give full weight to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." *Poulnot v. District of Columbia*, 608 A.2d 134, 137 (D.C.1992); *see also In re R.H.M.*, 630 A.2d 705, 707

(D.C.1993). Although we have recognized that, depending on the circumstances, eyewitness identification of strangers can be unreliable, *see e.g., Benn v. United States*, 978 A.2d 1257, 1265 (D.C.2009) (*Benn II*); *Webster v. United States*, 623 A.2d 1198, 1204 n. 15 (D.C.1993),[9] that is a consideration that must be evaluated by the trier of fact. Even "the testimony of a single eyewitness can be sufficient to support a conviction so long as a reasonable person could find the identification convincing beyond a reasonable doubt." *Benn II*, 978 A.2d at 1265 (quoting *Peterson v. United States*, 657 A.2d 756, 760 (D.C.1995)) (internal quotation marks omitted).

■ In this case, positive identifications were made by two witnesses [10] at a showup held some twenty-five minutes after the robbery. Although such "show-ups" necessarily involve a measure of suggestivity, we have also recognized their utility and reliability. *See, e.g., United States v. Hunter*, 692 A.2d 1370, 1376 (D.C.1997). Cartwright testified that he recognized T.C. not only by his facial features and dreadlocks, but also because "he was wearing the same wristbands that the person who robbed us did." Amato stated that he identified T.C. on the basis of his dreadlocks and facial features, and like Cartwright, he professed to have no doubt about the accuracy of his identification.

Aside from the identifications, the District relied heavily on the evidence that police found three apparently brand new twenty dollar bills on T.C.'s person, and that shortly before the robbery, Amato

---

9. The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.
*Webster*, 623 A.2d at 1204 n. 15 (quoting Felix Frankfurter, The Case of Sacco and Vanzetti (1927)).

10. Cartwright stated that on seeing T.C., he was "fairly certain" that T.C. was one of the robbers. Cartwright went on to testify, however, that he had no hesitation, at the showup or in the courtroom, in stating that T.C. was one of the persons who robbed him.

had obtained three such bills "from the 711 ATM up the block." In most instances, and perhaps in this case, such evidence should, to use the vernacular, "seal the deal." It would surely be a remarkable and improbable coincidence if Amato had been robbed of three brand new twenty dollar bills and if a short time later, a young man identified by the victims as the robber had in his possession three *different* brand new twenty dollar bills. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Poulnot,* 608 A.2d at 139.

In this case, however, there is an unusual quirk. Both complainants identified T.C. as the gunman, and they agreed that T.C.'s fellow-robber was wearing a mask. Cartwright testified that Amato gave the three twenty dollar bills *to the masked accomplice, not to the gunman,* and he expressed no doubt on that subject. Cartwright stated:

> [M]y friend then showed his wallet, to show that there was nothing in it. Then he emptied the other pocket and there was $60 that the other person had taken from him, that my friend, Kevin, had handed the $60 to *the other person.*
>
> Q *Did you actually see that occur?*
>
> A *Yes.*
>
> Q Could you see how the, the denominations rather, of the $60?
>
> A Yeah, they were in $20 bills, and they were brand new, we had just gone to 7–Eleven and they were brand new, just taken out of the ATM.

(Emphasis added.)

Amato, on the other hand, believed that he had handed over the bills to the gunman, and not to the accomplice. Amato's recollection was, however, far less positive than Cartwright's:

Q Where did you have that money?

A It was in my left pocket.

Q As you took [it] out, do you remember who[m] you gave it to?

A I believe it was the man with the gun, but I put my head like to the ground because I was, to be honest, was very upset that this all was going down and I was getting my money taken and there was a gun pointed at my friend. It was like [a] very emotional state.

It does not appear that counsel for either party [11] or, for that matter, the judge, recognized that if Cartwright, the complainant who appeared certain of his recollection, was to be believed, then all three bills were surrendered to the masked accomplice, but they were recovered from the young man who was identified by the victims as the robber with the handgun. In her oral findings, the judge, who had evidently taken copious notes, and who recited the evidence in considerable detail, specifically mentioned Amato's statement that he "gave that [money] to the man with the gun." The judge made no reference at all, however, to Cartwright's testimony that he had seen Amato give the bills to the masked robber and not to the gunman.

That the money was found on the alleged gunman does not, of course, establish that T.C. was innocent. Amato, though obviously uncertain, may have been right about which robber received the bills; Cartwright, who expressed no doubt, may nevertheless have been wrong. Moreover, even if the accomplice was the person who first obtained the bills in question, he may subsequently have turned them all over to the gunman (or, there being no honor among thieves, the gunman might even

---

11. In the trial court, T.M. was not represented by his counsel on appeal.

have robbed his masked confederate). Viewing the evidence in the light most favorable to the District, we cannot say, given the identifications and the other evidence, that the judge, as the trier of fact, clearly erred in finding beyond a reasonable doubt that T.C. was involved. We are therefore constrained to reject T.C.'s claim of evidentiary insufficiency.

Nevertheless, the issue is troubling. As we have noted, the police did not find any other fruits of the robbery on or near T.C., and the weapon with which the crime was carried out was never recovered. The alternative explanation for T.C.'s possession of the bills offered by the defense—that the three new twenty dollar bills were a part of T.C.'s ATM withdrawal on the previous day—becomes more plausible in light of the apparent discrepancy in the District's case. Although we do not believe that the uncertainty as to which robber

received Amato's money, or the failure of the court and counsel to detect this uncertainty, renders the evidence legally insufficient, it implicates T.C.'s claim that the judge inappropriately injected herself into the defense case by aggressively interrogating the defense witnesses while making no attempt to explore any possible weakness in the District's evidence.

# III.

## T.C.'s CLAIM OF JUDICIAL PARTIALITY

 T.C. contends that at the evidentiary hearing, "the court failed to maintain its role as a neutral judge." He asserts that the judge "extensively, unnecessarily, and disparagingly questioned only the witnesses for the defense." [12] T.C.'s claim is not without some support in the record, [13]

---

**12.** T.C. also complains that the judge objected, *sua sponte*, to certain defense testimony and then sustained her own objections. In general, this practice should be avoided, for making objections is the function of counsel and not the court. In this case, to be sure, two of three objections made and sustained by the judge were to obvious hearsay. But "hearsay evidence admitted without objection may be properly considered by the trier of fact and given its full probative value." *Abdulshakur v. District of Columbia*, 589 A.2d 1258, 1265 (D.C.1991) (quoting *Mack v. United States*, 570 A.2d 777, 782 (D.C.1990)). In *Abdulshakur*, the hearsay at issue related to a Mohawk computer printout, while in this case, the testimony to which the judge sustained her own objection was generated, albeit indirectly, by the defense attempt to introduce the printout of the bank record. Nevertheless, it is most improbable that counsel for the District would have failed to object to hearsay as obvious as that presented here, and we are satisfied that T.C. was not substantially prejudiced.

The third question to which the judge sustained her own objection, also referring to the bank printout proffered by the defense, was as follows:

Q And does it reflect any activity on or around July 1?
THE COURT: Leading, sustained.
Whether this question was improperly leading is debatable, and we discern no reason for the judge to intervene on her own initiative. As we have seen, however, the document was subsequently excluded for lack of a proper foundation. In sum, the judge's making and sustaining of her own objections, while unnecessary and perhaps improvident, did not constitute or even approach prejudicial error warranting reversal of the judgment.

**13.** T.C.'s claim that the judge's questioning was not impartial was raised for the first time on appeal, and the District argues, not without some force, *see Long v. United States*, 940 A.2d 87, 100–01 (D.C.2007), that our review should be for plain error only. Indeed, T.C. has not filed a Reply Brief or otherwise challenged the District's contention. We recognize, at the same time, that it would have been difficult to object to the judge's questioning when to do so would have risked irritating the person who was not only the trier of fact but also the individual who would be called upon to decide whether T.C., if found involved, would lose his freedom. *See Belton v. United States*, 581 A.2d 1205, 1212 (D.C.1990)

but we do not believe that it warrants reversal.

During the presentation of the District's case, the judge posed only a single question to one witness for the government, and no questions at all to any of the others. Specifically, she asked Amato whether he had seen the people who were presented to Cartwright during the show-up.[14] Although there were potential weaknesses in the District's case, including the failure of the police to recover the weapon or any of the property taken from the victims (except the three twenty dollar bills), as well as the (unnoticed) discrepancy as to which robber received those bills, the judge left the questioning of the District's witnesses almost entirely to the attorneys for the parties.

By contrast, the judge questioned at length, and with considerable asperity, the defense witnesses who claimed to have played basketball with T.C. and who attempted to provide him with an alibi. Indeed, the court's examination of these witnesses covers the same number of pages of the transcript as their cross-examination by the District's counsel. In the case of the last of these witnesses, Ronald Wright, the transcript contains four pages of examination by the Assistant Attorney General, but six and one-half pages of questioning by the judge.

The tone and manner of the judge's interrogation were sometimes openly in-credulous. In fact, the judge appeared on several occasions to be attempting to extract an admission, or to expose a contradiction, rather than to elicit information or clarify the evidence. The judge obviously disbelieved the testimony that the group of young men, some of them comparatively warmly dressed, had spent several hours playing basketball on a hot July day, and much of her questioning was addressed to this subject and to details incidental to it.

The first of these defense witnesses was C.S. After this young man had been examined by T.C.'s attorney and cross-examined by counsel for the District, the following dialogue ensued:

The Court: Wait just one second. You can retake the stand. What was T.C. wearing?

The Witness: To my knowledge, I remember him wearing a blue shirt with a blue visor and he had a blue skull cap on with some, I think, they were Two Park shoes, and he had on some jeans, yeah, I think some gray jeans or gray shorts.

The Court: Jeans with what?

The Witness: I think they were gray jeans or gray shorts.

The Court: And this was in July?

The Witness: Yes, ma'am.

The Court: And you had been playing basketball for four hours?

("it would be expecting too much to hold a defendant accountable for failing, in effect, to accuse a judge of bias at the hearing just before the discretionary, virtually non-reviewable act of sentencing takes place"); *Scott v. United States*, 559 A.2d 745, 755 (D.C.1989) (en banc) (stating that it "hardly would be appropriate to place on a criminal defendant the burden to attack a judge's integrity"). To some extent, T.C.'s attorney may have thought that he was between a rock and a hard place; he could object to aggressive questioning by the judge of defense witnesses only, thus im-plicitly accusing her of unfairness, with the possibility of less than favorable consequences for his client, or he could withhold any objection and risk waiving his claim of lack of impartiality. Because, for the reasons set forth in the text, we conclude that T.C.'s claim, even if treated as having been preserved, does not warrant reversal, we need not decide whether the plain error standard applies here, as it did in *Long*.

14. The suspects had been shown separately to Cartwright and to Amato.

The Witness: Yes ma'am.

The Court: And you were wearing long jeans or short jeans?

The Witness: Me?

The Court: Uh-huh.

The Witness: I had on jeans, long jeans.

When C.S. stated that "most of the people had on shorts," the judge returned to the previous subject of her questioning, with further skeptical interrogation:

The Court: And how long did you play basketball?

The Witness: I know it was some hours, but I'm not sure like the exact time.

The Court: Some hours?

The Witness: Yes, ma'am.

The Court: More than two hours?

The Witness: Yes, ma'am.

The Court: And you played in July, in the District of Columbia, basketball for two hours in long jeans?

The Witness: I wouldn't say exactly two hours, but yes.

The next defense witness was J.R. While questioning this witness, the judge was again openly skeptical of the claim that the group played basketball for hours in the heat, and she then pounced on what on what she evidently believed to be a contradiction, albeit on a collateral point, regarding the precise color of the skin of one of the players:

The Court: And Ronald [Wright] had been playing basketball with you for five hours, too?

The Witness: Yes, ma'am.

The Court: And you don't remember what Ronald was wearing?

The Witness: No, ma'am.

The Court: What does Ronald look like?

The Witness: He's light skinned, a little bit taller than me.

The Court: Taller than who?

The Witness: He's a little taller than me.

The Court: Uh-huh.

The Witness: And brown skin[ned].

The Court: He's light skinned and brown skinned?

The Witness: No, he's brown skinned.

The Court: You just said he was light skinned.

The Witness: I meant to say he was brown skinned.

After inquiring about Ronald's height, the judge finished with a rhetorical question which emphasized the perceived inconsistency:

The Court: So he's taller than 5'11," he's light skinned and brown skinned?

The Witness: He's brown skinned.

As we have previously noted, the judge interrogated the third young defense witness, Ronald Wright, at some length. Wright had been with T.C. when the young men were stopped by the police, and the judge inquired why he was out of breath at the time:

The Court: Now, how far had you run when the police stopped you?

The Witness: Excuse me, give me a minute, I'm trying to think. The block isn't very long, I say, we ran about 100 to 200 feet away from the court, up towards Jackson.

The Court: How many blocks did you run or did you run—

The Witness: We didn't run any blocks at all, it was less than a block. It was less than the street.

The Court: You ran less than one block?

The Witness: Way less.

The Court: Ran way less than one block.

The Witness: Yes ma'am.

The Court: You ran way less than a block and you were out of breath?

The Witness: We were already playing basketball previously, we had just stopped.

The Court: And you had stopped and rested, right?

The Witness: No, we had stopped and rested and continued playing.

The Court: Yes, you stopped and rested, you smoked marijuana.

The Witness: Yes.

After posing several other questions in which she repeated three times that Wright had smoked marijuana, the judge returned to Wright's explanation of why he was out of breath:

The Court: So you rested for five to seven minutes?

The Witness: Uh-huh.

The Court: Yes or no.

The Witness: Yes.

The Court: And then what did you do?

The Witness: Then we proceeded to walk off the court.

The Court: Uh-huh.

The Witness: And I turned to my right, saw the police coming out of the alleyway with their lights on.

The Court: So you've been resting from five to seven minutes—

The Witness: Yes ma'am.

The Court:—then you ran for way less than one block, and you were out of breath?

The Witness: Yes ma'am.

Thus, and not without considerable skill, the judge exposed the contradictory character, and even the apparent absurdity, of Wright's explanation.

In sum, the style of some of the judge's interrogation of the defense witnesses [15]

was that of a cross-examiner apparently seeking to compel the witness to acknowledge that his testimony was inconsistent or contrary to common sense, and thus untrue. Such questioning would have been perfectly appropriate if it had come from opposing counsel, but in this case, interrogation that often resembled partisan cross-examination was conducted by the judge, with the questioning directed to defense witnesses only.

We do not suggest by any means that a judge's posing of questions to witnesses is always inappropriate. On the contrary, as an illustrious British statesman wrote more than two centuries ago,

[a] judge is not placed in that high situation merely as a passive instrument of parties. He has a duty of his own, independent of them, and that duty is to investigate the truth.

EDMUND BURKE, *Report of the Committee on Warren Hastings' Trial*, 31 Parl. Hist. 348 (1794), quoted at IX WIGMORE ON EVIDENCE § 2484, at 277 (1981); *see also Bowman v. Roycel's Rental, Inc.*, 110 Daily Wash. L. Rptr. 2757 (Super.Ct.D.C. October 28, 1982) (quoting BURKE and WIGMORE). To be sure, this duty "to investigate the truth," if it exists at all under current law, does not vest the judge with authority to make an *ex parte* inquiry outside the courtroom, even in order to determine whether perjury has been committed at the very trial over which the judge is presiding. *Davis v. United States*, 567 A.2d 36, 38–40 (D.C.1989). However, "[t]he judge not only has the right but also the duty to intercede in an examination to draw more information from reluctant witnesses or experts who are either inarticulate, less than candid, or inadequately interrogated." *Haughton v. Byers*, 398 A.2d

---

15. The judge also briefly questioned T.C.

18, 20 (D.C.1979) (citation and internal quotation marks omitted); *see also Womack v. United States*, 350 A.2d 381, 382–83 (D.C.1976). Judicial intervention may also be permissible or even necessary when the judge detects "a patent omission which might vitiate a full adjudication of the defendant's guilt or innocence." *Perry v. United States*, 364 A.2d 617, 620 n. 4 (D.C. 1976); *see also Long*, 940 A.2d at 100 (in a jury trial, a judge may pose questions to witnesses, *inter alia*, to clarify testimony, to establish background facts, and to test the witness' memory).

Nevertheless, under our adversarial system, the judge's authority to question witnesses should be exercised sparingly, *Haughton*, 398 A.2d at 21, and when it is exercised, "the judge must at all times remain a disinterested and objective participant in the proceedings." *Davis*, 567 A.2d at 39. Moreover, the judge has an obligation not only to be impartial, but also to assure that the appearance of impartiality be preserved. *Scott*, 559 A.2d at 751.

Had the present case been tried to a jury, we would entertain some doubt as to whether the judge's aggressive questioning, directed to defense witnesses only, would have comported sufficiently with the principles of restraint and of adherence to the appearance of impartiality, which principles are designed to assure both that justice be done and that it seem to be done. In a bench trial, however, "a judge's questioning is less problematic because there is no risk of biasing a jury." *Long*, 940 A.2d at 100. Although the imbalance inherent in the judge's active interrogation only of witnesses for the defense gives us pause, we recognize that to the judge, the defense version of events evidently seemed suspicious and even incredible, while she discerned no comparable problem with the District's case. We

have no doubt that the judge was attempting to ascertain the truth, and that her questioning of witnesses was intended to promote that end. Accordingly, we conclude that on the record taken as a whole, reversal of the judgment is not warranted on the basis of the judge's intervention.

## IV.

## OTHER ISSUES

We briefly address three additional claims asserted by T.C. on appeal.

### A. *Amendment of the Petition*

T.C. contends that the trial judge erred by permitting the District to amend its petition by alleging a violation of the PFCV statute. The motion was filed a few days before the evidentiary hearing, and it was granted immediately before the hearing began. T.C. contends on appeal that the PFCV charge is an "additional or different offense" within the meaning of Super. Ct. Juv. R. 7(e), but he makes no serious or credible claim of prejudice. The District takes the position that all of the elements of PFCV were alleged in the armed robbery and CPWOL counts, and that the trial judge did not abuse her discretion in permitting the amendment.

In the trial court, T.C. did not assert that PFCV was an "additional or different offense." Rather, he claimed that the proposed amendment was untimely because "it's a substantive motion that shouldn't [sic] be filed prior to two or three days before trial." This claim differs materially from the claim on appeal, for Rule 7(e) permits a petition to be amended "at any time *prior to the conclusion of a fact-finding hearing* if no additional offense or different offense is charged and if substantial rights of the respondent are not prejudiced." (Emphasis added.) Accordingly, we review T.C.'s claim in this court for

plain error, for the issue raised on appeal was not presented to the trial judge with reasonable specificity, *see Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* 506 U.S. 991, 992, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992), or indeed at all.

We discern no plain error. Indeed, the only analogous decision that has been brought to our attention is directly contrary to T.C.'s position. *See Government of the Virgin Islands v. Bedford,* 671 F.2d 758, 765 (3d Cir.1982) (upholding a trial court ruling permitting the amendment of a criminal information where the amended information charged violation of a statute which was not cited in the original information, but which would necessarily have been violated if the allegations in the original petition had been proved). We need not decide whether we would follow *Bedford* if the claim had been preserved; we hold only that the trial court's ruling was not "plainly" or "obviously" wrong, and that no denial of substantial rights or miscarriage of justice has resulted from the trial judge's decision allowing the District to amend the petition. *See Thomas v. United States,* 914 A.2d 1, 8 (D.C.2006).

### B. *Exclusion of Internet Printout*

■ T.C. contends that the trial judge erred by excluding a printout of bank account activity from the Internet which allegedly showed that he withdrew $143.00 from his account on the day before the robbery. The judge excluded the evidence as hearsay and for lack of a proper foundation, noting that T.C.'s father, through whom the defense sought to introduce the printout, was not a custodian of the record. T.C. cites no contrary authority, and we agree with the District that there was no abuse of discretion. *See, e.g., Clyburn v. District of Columbia,* 741 A.2d 395, 398 (D.C.1999); *In re D.M.C.,* 503 A.2d 1280, 1282–83 (D.C.1986). We note, however, that this issue might well have been avoided if T.C.'s counsel had presented the evidence through an appropriate employee of the bank. *Cf. Roberts v. United States,* 508 A.2d 110, 111–12 (D.C.1986); *see generally Dutch v. United States,* 997 A.2d 685 (D.C.2010). Given the potential importance of the proffered printout—together with the testimony of T.C. and his father, the exhibit might have provided a plausible innocent explanation of T.C.'s possession of three apparently brand new twenty dollar bills—the failure of T.C.'s attorney to call a witness from the bank who could have authenticated the exhibit may have been imprudent, although the record on the point is admittedly sparse.

### C. *Limitation of Closing Argument*

■ T.C. also claims that the trial judge erroneously limited his counsel's closing argument. When T.C.'s attorney began to criticize the conduct of the show-up identification as unduly suggestive, the following exchange ensued:

COUNSEL FOR THE DISTRICT: Objection, Your Honor. If he's actually trying to argue that there's suggestivity or [lack of] reliability or fairness of the show up, that needed to be filed in a motion, not just argued in closing.

THE COURT: Sustained, you can continue.

COUNSEL FOR T.C.: That's as to whether that ID should be thrown out, completely. I'm arguing as to how accurate it was.

THE COURT: Go ahead.

Defense counsel did not immediately return to the suggestivity argument, although he did state later, without objection, that the description of his client was vague and "centers mostly upon the dreads."

We agree with T.C. that the objection should have been overruled. The failure

of the defense to file a motion to suppress precluded any challenge to the *admission* of the show-up identification, *see* Super. Ct. Juv. R. 12(b)(3), but T.C.'s attorney had the right to challenge the *weight* to be accorded to this evidence, and on appeal, the District does not dispute that this is so.

The judge's statements to defense counsel that "you can continue" and to "[g]o ahead" must be read in conjunction with her sustaining of the District's objection. It is unclear whether the attorney was being directed to "go ahead" with his original line of argument or, more probably, to continue his argument but to adapt it to the judge's ruling on the objection. However, because counsel could have asked for clarification but did not do so, and because, given his subsequent argument, the effect of the judge's ruling did not substantially prejudice T.C., we conclude that reversal is not warranted.

## V.

## CONCLUSION

For the foregoing reasons, the decision of the trial court is

*Affirmed.*

SCHWELB, Senior Judge, concurring:

I join the opinion of the court; indeed, I am its author. I write separately, however, because, notwithstanding my belief that the court has resolved correctly the legal questions presented on appeal, the way in which some of the actual or potential evidence was developed (or, more precisely, *not* developed) leaves me less than fully confident that justice has been done. If some issues (the existence of which, at least in hindsight, appears obvious) had been more thoroughly explored and presented, the question whether the District proved, beyond a reasonable doubt, that T.C. was one of the robbers would have

been closer, and the case might conceivably have been decided differently.

## I.

Although the identification evidence against T.C. was formidable—the two victims expressed certainty, at a show-up conducted shortly after the robbery, that T.C. was the gunman—it was surely T.C.'s possession of currency apparently stolen from Amato, namely, three fresh twenty dollar bills, that made the case against T.C. appear to be so overwhelming. As the opinion of the court recognizes, the eyewitness identification of strangers is often problematic, for even when an identifying witness professes certainty, "positive" may mean "mistaken at the top of one's voice." Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Testimony,* 29 Stanford Law Review 969, 985 & n. 57 (1977); *see also Webster v. United States,* 623 A.2d 1198, 1204 n. 15 (D.C. 1993) (citation omitted). But if the defendant is identified by the victims, and he is *also* found in possession of stolen property, then surely, in all but the most unusual cases, it is game, set and match for the prosecution (or, in this juvenile delinquency case, for the District). This is so because the identifications enhance the probative value of the recovery of the fruits of the robbery, and because the respondent's possession of stolen property tends to virtually eliminate any real question as to the reliability of the identifications. It is therefore reasonable to infer that it was T.C.'s possession of bills apparently identical to those taken from Amato—the same number and the same denomination—that erased any lingering doubt on the part of the judge that T.C. was one of the robbers.

Sometimes, however, there is more to a case than initially meets the eye. The record before us reveals that the three

fresh twenty dollar bills had not one but two possible sources—the ATM from which Amato withdrew money on the day of the robbery, but also a different ATM from which T.C. claimed to have made a withdrawal on the previous day. My concern in this case is that a significant discrepancy with the theory that the bills came from Amato was never noticed by the defense or by the judge, while evidence that the money found on T.C. had been withdrawn by him, and belonged to him, appears not to have been adequately presented or considered.[1]

The inconsistency in the District's evidence as to the origin of the three twenty dollar bills found on T.C. is discussed in some detail in the opinion of the court, and I recapitulate it here only briefly. The government's first witness, Vincent Cartwright, testified that it was the masked accomplice, and not the gunman,[2] who received the bills from Amato.[3] Indeed, Cartwright testified that *he saw* Amato give the bills to the man in the mask. If Cartwright's recollection was accurate, then it was surely unlikely (though certainly not impossible) that all three bills were in the possession of the accomplice immediately after the robbery, but that they had come into possession of the alleged gunman at the show-up some twenty-five minutes later.[4]

The defense sought to show, on the other hand, that the money in T.C.'s possession consisted of three fresh twenty dollar bills that he himself (and not a robbery victim unknown to T.C.) had extracted from an ATM. His trump card in this regard was supposed to be a bank statement, printed out by his father from the Internet, which allegedly showed a withdrawal of $143.00 from T.C.'s account[5]. T.C.'s father also testified that he found $80.00 in T.C.'s drawer following T.C.'s arrest. This testimony, if true, would support an inference that on the day of the robbery, T.C. was likely to have $60.00 (or slightly more) in his possession, potentially including three fresh twenty dollar bills.

But the defense's attempt to present this alternative theory regarding the origin of the three bills foundered in its presentation and ended in apparent disaster. Predictably, the bank record which T.C.'s attorney sought to introduce into evidence was excluded as hearsay, for counsel produced no witness from Chevy Chase Bank to authenticate it. Counsel then attempted to present the next best evidence, namely the testimony of a witness who knew that T.C. made the withdrawal. The witness was T.C.'s father, and the following exchange ensued:

> THE COURT: Did you personally observe your son taking money out of an

---

1. I say "appears" because T.C.'s trial counsel has not had the opportunity to explain why he took (or failed to take) some seemingly appropriate steps.

2. The District's theory was that T.C. was the gunman.

3. While Amato thought that he gave the bills to the gunman, he was anything but certain.

4. Since the judge participated aggressively in the questioning of defense witnesses regarding possible discrepancies in their testimony, she might have been expected to pursue, on her own initiative, the question who (the gun-

man or the masked accomplice) obtained possession of Amato's twenty dollar bills. Unfortunately, neither she nor the attorneys noticed the possible contradiction, and the point was not explored.

5. As noted in the opinion of the court, this document is apparently not a part of the record. One wonders whether the sum of precisely $143.00 can be withdrawn from an ATM—it is more usual to withdraw a number of $20.00 bills—but this point is not addressed in the record.

ATM machine or getting money from some other location?

[J.C.'S FATHER] I did not personally observe it, but I was told by his mother he did.

THE COURT: Hearsay, sustained.

T.C.'s mother, who, as we shall see, was present during at least some of the proceedings, was not called to testify. Even more significantly, the record on appeal contains no explanation as to why no witness for Chevy Chase Bank was called to authenticate, as a business record maintained in the ordinary course of business, the alleged documentary proof that T.C. withdrew the money. T.C. did take the stand on his own behalf, and he stated that he made the withdrawal and took $60.00 with him on the following day, but the defense side of the dispute as to the source of the bills in T.C.'s possession at the time of his arrest was essentially confined to the self-serving testimony of the juvenile accused himself. Obviously, the judge did not believe T.C.'s uncorroborated account. Indeed, in her oral findings, the judge did not even mention T.C.'s testimony regarding his ATM withdrawal.

If a representative of Chevy Chase Bank had authenticated the document reflecting T.C.'s transaction, if T.C.'s mother had testified that she saw him withdraw money from the ATM, and if the document conformed to the defense description of it, then the posture of the issue confronting the judge would have been materially different. Moreover, if the judge had taken note of Cartwright's testimony that the bills were surrendered to the masked accomplice rather than to the gunman, or if T.C.'s attorney had brought this testimony

to the judge's attention, it would have been more difficult to reject as baseless, and as unworthy of mention in the court's findings, a defense version supported by a properly identified and authenticated bank statement.

## II.

My uneasiness regarding the foregoing apparent shortcomings in the preparation and presentation of T.C.'s side of the case is reinforced by a discussion between the judge and T.C.'s parents that occurred immediately *after* the judge had announced her decision. This discussion is obviously not evidence, nor is it relevant to T.C.'s insufficiency claim, for the evidentiary record was closed before it arose. Nevertheless, for the reasons set forth below, I believe that it warrants mention in this concurring opinion.

The judge and counsel were considering possible dates for disposition,[6] but both T.C.'s father and his mother stated that they would not be in town on the suggested date. The mother explained that they were "going on a cruise from the 11th to the 18th" (of October 2008). The judge inquired whether the parents were proposing to take T.C. with them. The father responded that "[w]e were hoping to, Your Honor," and he then volunteered his belief in T.C.'s innocence. According to the father, it was hard to believe that his son could have robbed somebody "two blocks from [where] he saw his mother about 8:50." The father told the judge that T.C. saw his mother teaching his sister to ride a bicycle at about 8:50, and the mother stated that "I was up on the [basketball] court myself for a while."[7] The father then

---

**6.** "Disposition" is the juvenile equivalent of "sentencing."

**7.** The judge, obviously astonished by this turn of events, remarked to the mother: "But you

didn't testify about it." The mother responded, that "[h]e [apparently referring to T.C.'s attorney] didn't let me." The judge stated that the mother "had every opportunity to testify and didn't." The mother responded

assured the judge that T.C. had "never been in trouble at all, he's been in private school, and he's been [an] altar boy." The father found it hard to believe that shortly after watching his mother teach his sister to ride a bicycle, T.C. would commit an armed robbery two blocks away.

Like the trial judge, I am in no position to evaluate the defense trial strategy. But astonishingly, it was not revealed until after the case had been decided that T.C., who came from an intact[8] and apparently reasonably well-to-do family,[9] had never been in trouble and was an altar boy at his church. Thus, the judge was not apprised of background facts which might well have conveyed a more favorable impression of T.C. to the judge. The defense called no character witnesses, and defense counsel made no attempt to have T.C. or his father[10] introduce themselves to the court or tell the judge who they were in any meaningful way.

The transcript is telling. After asking T.C. to spell his name, the defense attorney immediately turned to the events of the robbery, without asking T.C. a single question about himself. Although T.C.'s father held a responsible position in the District of Columbia government, counsel never inquired about that, or about any other aspect of the father's background.[11] The result was that when determining T.C.'s guilt or innocence, the judge knew little or nothing about him or his family background, and the little that she did know came to her attention more or less by accident, and not as a result of any perceptible defense strategy.

The opportunity of both son and father to introduce themselves should not have been wasted. The trier of fact, whether judge or jury, should not be left to guess who, or what kind of a person, a witness is, especially if the witness is the client (or, here, one of them is the client's father). I quote a leading primer on trial tactics:

> An introduction to the witness's background should be elicited at the very beginning of the witness's testimony. This introductory information is also known as pedigree information. Pedigree information often informs the jury[12] about such matters as the witness's residence, employment, education and relationship to the other parties in the trial. *Though basic, background facts do help build credibility with the jury. The jury will tend to be more trusting of a person they feel they know personally.*

1A Cipes, Bernstein & Hall, Criminal Defense Techniques § 24A.07 (3) (Matthew Bender, Rev. Ed. 2010) (emphasis added). I had thought that this principle was a "must" in any effective trial strategy, and that trial lawyers would be careful to adhere to it. In this case, however, neither

"Well, okay. He didn't call me." The judge explained, correctly, that "I don't have anything to do with your son's trial strategy."

8. Perhaps because most of the young men charged with criminal conduct in this jurisdiction come from single-parent homes, counsel for the District asked T.C. whether he lived with his mother *or* his father. T.C. replied that he lived with both and that his parents lived together.

9. The father held a responsible position, and the family was proposing to go on a week's cruise. According to the father, T.C. had attended private school. This is of marginal significance, however, for rich folks commit crimes too.

10. Or, indeed, any of the defense witnesses.

11. The father subsequently volunteered, on his own initiative, where, and in what capacity, he was employed.

12. Although the quoted passage refers to jury trials, the principle applies with equal force when the judge is the trier of fact.

counsel for the District nor T.C.'s attorney asked witnesses about their backgrounds or pedigree.

One can have no doubt, after reading the transcript, that T.C.'s parents were profoundly disappointed by the outcome of their son's case, and that they believed that the system did not work fairly for T.C. For the reasons stated in the opinion of the court, I agree that the evidence was sufficient to support the judgment and that there is no legal basis for reversal. For the reasons stated in this concurring opinion, however, I can appreciate the parents' concerns, and I find them understandable. There are no perfect trials, but this one could have been better.