Carlos O. MELENDEZ, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–244.

District of Columbia Court of Appeals.

Argued Nov. 17, 2010.

Decided March 3, 2011.

Thomas E. Heslep, Washington, DC, for appellant.

Katherine M. Kelly, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, and Roy W. McLeese III and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, GLICKMAN, Associate Judge, and BELSON, Senior Judge.

WASHINGTON, Chief Judge:

Carlos Melendez appeals from his conviction for second-degree murder as the lesser-included offense of his charged crime, first-degree murder. Because we find none of his arguments to have merit, we affirm his conviction.

### I.

On March 7, 2006, Carlos Melendez was charged with five counts: (1) kidnapping while armed (of Mayra Margot Gutierrez); (2) kidnapping (of Moises Cardoza); (3) carjacking while armed; (4) first-degree felony murder; and (5) first-degree premeditated murder. After a jury trial, Melendez was found guilty of second-degree murder as a lesser-included offense of first-degree premeditated murder (count 5) and of the kidnapping of Moises Cardoza. He was acquitted of the kidnapping while armed of Mayra Margot Gutierrez ("Margot") and of first-degree felony murder, as well as its lesser-included offense of second-degree murder. The carjacking charge was dismissed at trial. After the trial, the trial court granted Melendez's motion for a judgment of acquittal on the kidnapping charge. Thus, the only conviction that resulted from Melendez's trial was for second-degree murder as a lesser-included offense of first-degree premeditated murder.

All of the charges against Melendez stemmed from the June 5, 2005 murder of Margot, whose body was found in a stairwell at 3132 16th Street, Northwest. Melendez had previously lived with Margot and her three children in Baltimore, Maryland. Celino Marcia, the father of the three children, had also previously lived with Margot but moved out around the time Margot began dating Melendez. While Melendez was living with Margot, Margot's friend Keila Gonzalez ("Keila") also moved into Margot's home.

At trial, Keila testified that she overheard many arguments between Melendez and Margot that usually took place in their bedroom, often as a result of Melendez's jealousy. According to Keila, Margot would often look disheveled after such arguments and asked Keila multiple times to call the police. In March or April of 2005, Margot asked Keila to move out because of Margot's troubles with Melendez, and Keila moved five or six houses away to stay with her friend, Myra Cardoza, and Myra's four-year-old child, Moises Cardoza ("Moises"). Soon thereafter, Melendez and Margot broke up and, according to Melendez's friend Salvador Blanco, Melendez sought to make amends with his previous long-time lover, Rosario Ventura, by moving in with Ventura's brother in Woodbridge, Virginia. Ventura lived at the 16th Street address where Margot's body was ultimately found.

On June 4, the day before Margot's murder, Keila overheard a phone call in which Melendez told Margot that he wanted to see her to return her rings to her. Maribel Variela, Margot's mother, also tes-

tified that about a week prior to the June 5 murder, Melendez had called her asking for Margot's whereabouts. Variela said that she had also called Melendez around the same time to ask him to return Margot's rings, which he said he would.

On the morning of June 5th, the day Margot was murdered, Margot invited Keila to a barbeque hosted by Margot's cousin, Yamileth Torres, in Silver Spring. Variela also testified that she spoke to Margot that morning and that Margot had told Variela that she intended to go to Torres' barbeque later that afternoon. Keila declined to attend but instead took one of Margot's children shopping, while Margot took Moises with her to the barbeque. Margot never arrived at the barbeque, and Torres' calls to Margot seeking an explanation were never answered.

At about 2:30 or 3:00 on the afternoon of June 5, Fausto Arguta discovered Margot's body in the stairwell of the apartment building in which he lived at 3132 16th Street, Northwest. The body was located in the second-floor stairwell about thirty feet from Ventura's apartment. It appeared to the police detective who responded that the body had been placed in the stairwell after the attack and that the attack had not taken place far away. Margot's car was found in the parking lot behind the apartment building the next day. An autopsy revealed that Margot had been strangled to death and that there were marks on her body consistent with being dragged while unconscious.

Keila testified that later that afternoon in Baltimore, around 5:30 or 6:00, she was at the home she shared with the Cardozas when she saw Moises running alone down the alley behind the home looking very upset. Keila asked where Margot was, and he told her Margot was "with [Melendez]" and to "call the doctor." Moises told Keila that he and Margot had gone to a park to get some rings from Melendez and that Melendez had put a knife to Margot's neck and taken them to Melendez's house. According to Keila, Moises said that he had "seen" Melendez punching Margot as they came out of the bathroom of Melendez's house, that Margot's hands and mouth had been taped, and that she had been "thrown to the ground." Moises also told Keila that Melendez had then driven Moises home to Baltimore. At that point, Keila called Margot many times but got no answer, and also called Baltimore police and Margot's mother, Variela, to tell her that Margot was missing.

Moises also testified at trial. He identified Melendez in the courtroom and said that although he did not know how Margot died on June 5, he knew Melendez had killed her. Melendez had taken Moises to a room, where Moises sat, and gone into another room where Moises could hear Margot screaming to help her. Moises did not help because he was scared Melendez would harm him too, since Melendez had a knife, tape, some gloves, and a bag. Moises testified that he did not see what Melendez did with these items, but that Melendez later took Moises back to his home in Baltimore in Margot's car, without Margot, at which point Moises told Keila everything that had happened.

The day after the murder, in an interview with Baltimore Police Detective Donald Bradshaw, Moises orally identified "Carlos Melendez" through a translator as the one who harmed Margot. Two days later, D.C. Police Detective Maria Flores also interviewed Moises, who told her that he had witnessed Margot's murder and that "Carlos" was the one who hurt her. Flores conducted a second interview of Moises two days after that and showed him a confirmation. photograph, in which he identified Melendez as "Carlos."

During the investigation that ensued, the police recovered a group of rings and trash bags from the living room and bedroom of Ventura's apartment at 3132 16th Street. A search of Melendez's truck on June 25 revealed two cell phones, a light blue bathroom rug on which were found fibers from the pink pants Margot wore on the day she was murdered, and a knife. Also, Margot's cell phone was recovered from the passenger door pocket of Melendez's work van.

At trial, two Sprint employees testified regarding Margot's and Melendez's cell phone records. The records revealed that Margot received a call from Melendez at 1:20 p.m. on June 5, and that both phones were transmitting from the same tower in Northwest D.C., located 1.5 blocks from where Margot's body was found. Both continued to use that tower until 2:15 p.m.; by 5:04 p.m. that day, both phones were transmitting from a different tower in Baltimore less than a half-mile from Margot's home. By 6:31 p.m., they were transmitting from the same Northwest D.C. tower as previously, and after 7:30 p.m. from a different tower in Woodbridge, Virginia, about five miles from Melendez's home.

In his defense, Melendez introduced evidence that it was Margot's former lover Celino Marcia who was Margot's true murderer and not him. First, Melendez called his former girlfriend, Ventura, who testified that she received a call from Marcia in 2005, telling her that Melendez was hanging out with "his wife" Margot and that they should do something to break the two up and also asking for Ventura's address. Ventura testified that Marcia said he "was going to do whatever was possible" to separate Margot and Melendez. Melendez also called two Baltimore police officers who testified that on separate incidents, they had responded to calls at Margot's house that she shared with Marcia at the time, each time in response to an alleged assault by Marcia.

Melendez's final witness was Marcia himself. He testified as to his prior relationship with Margot and said that while he was upset when Margot began dating Melendez, he got over it. Marcia admitted calling Ventura to say that Melendez should leave Marcia's home alone and asking for Ventura's address, but denied threatening Ventura or saying that he would do everything in his power to break Margot and Melendez up. Marcia testified that on the morning of the murder, he saw Margot with Moises at a gas station but did not ask where she was going. During the same gas station encounter, Marcia asked Margot why she was out with other people's children (Moises) and not her own, but testified that he was not angry about it. Marcia also testified that although Margot was the complainant in a court case pending against him stemming from a domestic violence incident between the two, it had been dropped before her death. Although he met with the prosecutor about Margot's homicide in 2005, Marcia did not learn that he would be a witness in this case until three days before his testimony. Finally, Marcia denied killing Margot and testified that he loved her very much.

## II.

Melendez's primary argument on appeal is that the trial court abused its discretion by precluding Melendez from presenting, from the start of trial, a third-party perpetrator defense: that Marcia, rather than Melendez, killed Margot. The trial court did eventually allow Melendez to make this very argument, but not until the government had rested its case-in-chief. Melendez contends that the error occurred as a result of a combination of the trial court's failure to: (a) allow Melendez to mention

his theory that Marcia was the killer in his opening statement; (b) allow Melendez to cross-examine the government's witnesses for bias toward Marcia; and (c) properly address improper argument in the prosecution's rebuttal argument. Because the trial court properly addressed this issue when it arose as the trial progressed, Melendez's appeal on this issue fails.

■ We review a trial court's determination on the admissibility of a third-party perpetrator defense for abuse of discretion, and that determination "will be upset on appeal only upon a showing of grave abuse." *Gethers v. United States*, 684 A.2d 1266, 1271 (D.C.1996); *McCraney v. United States*, 983 A.2d 1041, 1050 (D.C. 2009).

■ Melendez's failure to provide a sufficient proffer before his initial efforts to introduce evidence of a third-party perpetrator defense dooms his appeal on this issue. Before a trial court will allow evidence of a third-party perpetrator defense, it must be confident that the evidence "tend[s] to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Winfield v. United States*, 676 A.2d 1, 5 (D.C.1996). A defendant's proffer that demonstrates only that the third party "had even stronger motives to murder the victim than the accused is insufficient, without more, to establish the required link to the offense charged." *Id.* (citation omitted). Thus, "the trial judge ordinarily may exclude evidence of third-party motivation unattended by proof that the party had the *practical opportunity* to commit the crime, including at least inferential knowledge of the victim's whereabouts." *Id.* (emphasis added). Even if there is a sufficient proffer that the third party had such a practical opportunity, the trial court must then "balance the probative value of the evidence against the risk of prejudicial

impact." *Id.* As a result, the trial court "retain[s] full authority" to "exclude marginally relevant evidence creating the danger that proof of prior dealings or hostility between the victim and third persons will distract the jury from the issue in" the case at trial. *Id.*

■ Here, we are satisfied that the trial court did not abuse its discretion by withholding a final ruling on the *Winfield* third-party perpetrator issue until Melendez had provided a more concrete proffer. While Melendez was able to provide evidence that Marcia may have had a motive to harm Margot, he could not initially provide sufficient evidence that Marcia had the opportunity to do so on June 5th. In Melendez's original pretrial *Winfield* proffer, Melendez proffered five pieces of evidence: (1) that Baltimore police officers would testify that they had responded to previous reports of domestic violence by Marcia against Margot; (2) that Melendez had placed the 911 call for one of these incidents, placing him and Marcia in "adversarial posture;" (3) that Marcia called Ventura seeking her help in preventing Melendez from seeing Margot; (4) that Marcia and Margot had a chance meeting at the gas station on the morning of her murder; and (5) that Melendez received a phone call in the days after the murder in which a male voice indicated he had harmed Margot and that Melendez would get a "big surprise," after which Melendez allegedly received Margot's cell phone in the mail.

Without more, the fact that Marcia had a chance meeting with Margot at a gas station in Baltimore on June 5 is insufficient to show that he had the opportunity to kill her later in the day in the District of Columbia, merely because it theoretically would have been possible for Marcia to follow her there. Thus, we are satisfied that the trial court properly exercised its

discretion by excluding evidence that Marcia was the true murderer until Melendez provided a stronger proffer that Marcia was "in any way connected with the actual" murder. *See Williamson v. United States,* 993 A.2d 599, 606–07 (D.C.2010) (upholding trial court's exclusion of *Winfield* defense where, among other things, no trial witness could place the third party at the crime scene); *Resper v. United States,* 793 A.2d 450, 460 (D.C.2002) (discussing opportunity of the third-party perpetrator to commit the crime and noting that "[t]he fact that others with reason to seek revenge may have been present in a neighboring state, in the District, or, perhaps, even in a nearby neighborhood, does not, without more, satisfy the requirement of 'practical opportunity' "); *Bruce v. United States,* 820 A.2d 540, 546 (D.C. 2003) (holding that a proffer of evidence that is "clearly speculative" of the third-party perpetrator's involvement in the crime is insufficient); *Gethers, supra,* 684 A.2d at 1272 (failing to find abuse of discretion where defendant made no proffer that a third-party perpetrator was "connected in any way" to the crime on trial). Melendez's counsel himself admitted that "where the defense falls short . . . is being able to proffer that [Marcia] . . . came from Baltimore down to Washington [after the gas station meeting] . . . ." Therefore, the trial court did not abuse its discretion by precluding third-party perpetrator evidence at this point during the trial.

### A. *Opening Statement*

■ Having determined that the trial court's exclusion of evidence of a third-party perpetrator defense was a proper exercise of its discretion, the trial court's decision to preclude Melendez from making such an accusation in his opening statement could not be considered an abuse of discretion. While defendants are entitled to present opening statements, "the scope and extent of [a] defendant's opening statement rests largely within the discretion of the trial judge." *Jennings v. United States,* 431 A.2d 552, 560 (D.C.1981). Although the trial court precluded the defense from "point[ing] the finger" at Marcia by name in its opening statement, the trial court expressly permitted the defense to "tell the jury that the evidence is going to show that a person other than [Melendez] committed this offense;" the defense merely could not say who that person was. In fact, in his opening statement, Melendez's counsel argued that "what the defense is going to suggest to you throughout this trial [is] that someone other than Mr. Melendez killed this woman." Because this was a perfectly reasonable limitation in light of Melendez's insufficient *Winfield* proffer, we cannot hold that the trial court abused its discretion by limiting Melendez's opening statement in this fashion.

### B. *Cross–Examination of Government Witnesses*

■ Similarly, the trial court's parallel limitation upon Melendez's cross-examination of government witnesses was also proper. Where a trial court appropriately precludes introduction of evidence of a third-party perpetrator defense due to an insufficient *Winfield* proffer, its limitation on cross-examination of witnesses to exclude questioning about that defense is not an abuse of its discretion. *McCullough v. United States,* 827 A.2d 48, 56–57 (D.C.2003) (upholding trial court's preclusion of cross-examination of witnesses regarding the insufficiently-proffered third-party perpetrator defense while permitting questioning on a range of other relevant issues). In the instant case, the trial court prohibited Melendez from cross-examining government witnesses "in a way that tends to show that [Marcia] did this until [it had]

resolved the *Winfield* issue." The trial court continued to say that this ruling did "not mean that [the defense] is precluded from cross-examining [on] an issue of bias or a motive to curry favor with the government that might come up with Mr. Marcia.... But if it involves Mr. Marcia, you ought to raise it with [the court] first." Both the trial court and the government agreed that if Melendez eventually prevailed on the *Winfield* issue, he would be permitted to recall the previously-examined government witnesses in his own case-in-chief, if necessary. Melendez never sought to do so and never objected to this ruling. Since the trial court properly deemed Melendez's *Winfield* proffer insufficient, we are satisfied that it also properly exercised its discretion by limiting his cross-examination of government witnesses in this manner.

### C. *Prosecutor's Remarks in Rebuttal*

After the government rested its case-in-chief, Melendez provided a final, more concrete *Winfield* proffer which the trial court ultimately found sufficient. This proffer contained one additional piece of evidence that tended to indicate that Marcia had the opportunity to commit the murder: according to Rosario Ventura, Melendez's "common law wife" who lived in the building where Margot's body was found, Marcia had telephoned Ventura and asked for her address a few months prior to the murder. Melendez's counsel added that when Ventura asked why Marcia wanted this information, Marcia said "because I want to get him out of the way." This newly-proffered evidence swayed the trial court to accept Melendez's *Winfield* proffer since, in the trial court's opinion, Ventura's testimony was "the single most im-portant aspect" of the proffer because it provided most of the "factual basis" of the "threats, et cetera, from Mr. Marcia to Ms. Ventura about the defendant and Margot." The trial court concluded that Marcia's request of Ventura's address was "arguably a point of opportunity or tend[ed] to show some opportunity" and thereafter allowed Melendez to introduce a third-party perpetrator defense implicating Marcia.

After this ruling, Melendez presented his week-long defense case, arguing in closing that the evidence showed that Marcia, not Melendez, was Margot's murderer. In rebuttal, the prosecutor discredited this theory, telling the jury that

> the defense does not put Celino Marcia on the radar screen until last week when [Ventura] testified.... It's only after, you know, that that whole little jail scam [1] does not work out, they probably figure out let's get Celino Marcia on the stick.... Why would [any other witnesses] mention anything about [Marcia] ... if the defense did not think to put him as a suspect until last week? That is absurd.

Without any defense objection, the trial court *sua sponte* convened a bench conference and expressed its displeasure at this line of argument in the wake of extended *Winfield* litigation prior to trial. When the trial court admonished her, the prosecutor said she would move on, and defense counsel asked for "a correction." The trial court indicated that it was "open to the idea" of issuing some sort of corrective statement, but was not sure what the substance would be; defense counsel was also at a loss for what would be an appropriate limiting instruction. At that point, the

---

1. This "jail scam," which is irrelevant to this appeal, involved an incident in which a handwritten note was confiscated from Melendez while he was in jail and returning from a social visit there with Ventura. The note described a plan by which another individual would be framed for Margot's murder.

rebuttal continued and the prosecutor did not return to this line of argument. Nevertheless, on appeal, Melendez asserts that it was error for the trial court to fail to provide an additional remedy to cure any impropriety arising from the prosecutor's statements.

Because the trial court intervened immediately upon hearing the prosecutor's improper argument and offered to provide a limiting instruction if Melendez could devise one that would cure the error, Melendez's failure to offer a curative instruction means that we review this incident for plain error. *See Irick v. United States,* 565 A.2d 26, 32 (D.C.1989) (noting that in instances of alleged prosecutorial misconduct, "[w]here the defendant failed to object ... we will reverse his conviction only if the misconduct so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial"). As the Supreme Court has held, "reversal for plain error in cases of alleged prosecutorial misconduct should be confined to 'particularly egregious' situations." *Id.* (citing *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (noting that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements must be viewed in context")). Since the comment at issue was made in the government's rebuttal, it "must be viewed in perspective by examining the arguments of the defense." *Coleman v. United States,* 515 A.2d 439, 450 (D.C. 1986). In reviewing the trial court's actions, we must consider, in context, "the gravity of the [improper argument], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Lee v. United States,* 668 A.2d 822, 830 (D.C.1995) (finding prosecutor's "serious but isolated misstatement" of evidence

in rebuttal not to be harmful error, much less plain error).

▮ Assuming *arguendo* that the prosecutor's comment was improper, it only related to the issue of Melendez's guilt by inference—namely, that since the defense's claim that Marcia was the killer was a recent fabrication, Melendez was the actual killer. In light of the strength of the government's case against Melendez, including Moises' eyewitness testimony and identifications, the cell phone records, and the physical evidence, the prosecutor's statement was not so grave as to warrant a finding of plain error based upon the trial court's response. Most importantly, the trial court itself intervened *sua sponte* to prevent any further improper argument and provided Melendez an opportunity to craft a suitable limiting instruction, which he declined to do. Under these circumstances, we cannot say that the trial court's response to the prosecutor's remark "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceeding." *See Daniels v. United States,* 2 A.3d 250, 263 (D.C.2010) (citing *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

In sum, the trial court properly exercised its discretion by excluding evidence of a third-party perpetrator defense until Melendez provided a sufficient *Winfield* proffer, and it did not plainly err by responding to the prosecutor's remarks in rebuttal. We therefore deny Melendez's appeal on this issue.

### III.

Melendez's second argument is that the trial court abused its discretion by admitting, as excited utterances, testimony from Keila regarding Moises' statements to her upon his arrival at her home after Melendez dropped him off. Under the circum-

stances of this case, we also conclude that this argument is without merit.

When an appellant challenges the trial court's admission of hearsay statements as excited utterances, "[t]he underlying factual findings are reviewed under the 'clearly erroneous' standard...." *Odemns v. United States*, 901 A.2d 770, 776 (D.C.2006). As with all hearsay exceptions, "the determination of whether a statement falls under [the excited utterance] exception ... is a legal conclusion, which we review *de novo.*" *Dutch v. United States*, 997 A.2d 685, 689 (D.C. 2010) (citing *Brown v. United States*, 840 A.2d 82, 88 (D.C.2004)). Once we have determined that a statement qualifies for the excited utterance exception, "the decision whether to admit or exclude the proffered statement ... is reviewed for abuse of discretion." *Odemns, supra*, 901 A.2d at 776. For a statement to qualify as an excited utterance and therefore as an exception to the general prohibition against hearsay evidence, three elements must be met:

> (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.

*Id.* at 776. Moises clearly experienced a "serious occurrence" when he witnessed Margot's murder and was driven directly home, in silence, by the man he witnessed commit the murder. According to Keila, once Moises arrived home, he ran up to her and appeared "very scared," "excited, nervous, and cold," "tired, very shocked, greenish," and "very upset" when he told her what happened. Moises himself confirmed that he was "a little scared" and "nervous" at the time. Thus, the admissibility of Keila's testimony as to what Moises told her depends on the second and third excited utterance elements.

With respect to the reasonableness of the interval between the underlying event and the later statements, "the time element is not controlling, [but] it is of great significance." *Alston v. United States*, 462 A.2d 1122, 1127 (D.C.1983). When the declarant is a child "of such an age as to render it improbable that [his] utterance was deliberate and its effect premeditated," his statements "need not be so nearly contemporaneous with the principal transaction as in the case of an older person, whose reflective powers are not presumed to be so easily affected or kept in abeyance." *Beausoliel v. United States*, 71 App.D.C. 111, 114, 107 F.2d 292, 295 (1939). We have upheld the admissibility of statements as excited utterances even when they were made hours after the underlying event occurred. *See, e.g., Williams v. United States*, 859 A.2d 130, 140 (D.C.2004) (admitting utterance of two-year-old made "within a few hours" of event); *Harris v. United States*, 373 A.2d 590 (D.C.1977) (two-hour discrepancy). Additionally, if a statement is made upon the victim's first opportunity to disclose the events to a trusted individual it is more likely to qualify as an excited utterance. *See Bryant v. United States*, 859 A.2d 1093, 1107 (D.C.2004) (admitting statement made to officers at conclusion of six-hour ordeal since it was victim's first opportunity to tell anyone about events). Even if the victim's responses were to "preliminary investigative questions," if they were made "while the declarant is still under the spell of the startling event," the statements may qualify as excited utterances. *Reyes v. United States*, 933

A.2d 785, 791 (D.C.2007) (admitting statements in response to officers' question of "what happened?"). The "decisive factor" in determining the admissibility of excited utterances is that "circumstances reasonably justify the conclusion that the remarks were not made under the impetus of reflection" or premeditation. *Odemns, supra*, 901 A.2d at 777.

Although there was a significant time gap of at least an hour and forty-five minutes between Margot's murder and Moises' statements to Keila, the statements were sufficiently spontaneous to qualify under the excited utterance exception. After four-year-old Moises witnessed the murder, he was driven straight back from the District to Baltimore by Melendez, the murderer, without stopping. Moises feared saying anything because he believed Melendez might kill him too. When he finally arrived home in Baltimore after a silent, uninterrupted car ride, Keila testified that he ran up to her and she asked him "Who are you with? Where's Margot?" Moises responded that Margot was "with Carlos" and that Keila should "call the doctor." He then relayed what had happened earlier that day to Keila, who was interjecting her own questions with his statements in order to understand what he was saying and to calm him down. Under these circumstances, there is no indication that Moises' statements to Keila were made under the impetus of reflection. Moises endured hours of terror, ran up to the first trusted individual he encountered, and blurted out what happened. Although this took place well after the murder occurred, under these facts, we are satisfied that Moises' initial statements to Keila qualified as excited utterances, and we cannot find that the trial court abused its discretion by admitting Keila's testimony regarding those statements. Therefore, Melendez's appeal on this issue fails.

## IV.

Melendez next challenges the trial court's admission of Detective Bradshaw's testimony that on the day after the murder, Moises told him that "Carlos Melendez" was the one who harmed Margot. Assuming *arguendo* that Melendez did not waive this claim, we review this appeal for plain error since Melendez did not object to the admission of this statement at trial. *See, e.g., Bacchus v. United States*, 970 A.2d 269, 275 (D.C.2009). We will reverse only if Melendez can show "(1) error, (2) that is plain, (3) that the error affected [Melendez's] substantial rights, and (4) that the error seriously affected the fairness, integrity, or public reputation of the judicial proceeding, i.e., a showing of manifest injustice or a miscarriage of justice." *Id.*

Under D.C.Code § 14–102(b)(3) (2001), "[a] statement is not hearsay if the declarant testifies at the trial … and is subject to cross-examination concerning the statement and the statement is … an identification of a person made after perceiving the person. Such prior statements are substantive evidence." *See also, e.g., (Larry) Brown v. United States*, 840 A.2d 82, 88–89 (D.C.2004). Here, Moises made the statement to Bradshaw identifying Melendez after perceiving him the day before, both during Margot's murder and during his ride back to Baltimore, and he was subject to cross-examination when he later testified at trial. The fact that by the time Moises himself testified he could not recall his conversation with Bradshaw does not render him "unavailable" for cross-examination and thereby preclude application of the prior identification exception. *See United States v. Owens*, 484 U.S. 554, 561–62, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (holding that a "witness' assertion of memory loss" does not

render him unavailable to cross-examination for the purposes of the prior identification exception); *Blunt v. United States*, 959 A.2d 721, 732 (D.C.2008). Similarly, the fact that Moises communicated to Bradshaw through an interpreter does not itself render his statements hearsay. *See United States v. Lopez*, 937 F.2d 716, 724 (2d Cir.1991) (noting that "[e]xcept in unusual circumstances, an interpreter is no more than a language conduit and therefore his translation does not create an additional level of hearsay"); *accord United States v. Cordero*, 18 F.3d 1248, 1252–53 (5th Cir.1994). Even if any error had occurred as a result of the admission of Bradshaw's testimony, Moises' own testimony identifying Melendez as Margot's killer, as well as his in-court and photographic identifications of Melendez, satisfy us that the error did not amount to plain error, and thus Melendez's claim on this issue fails.

## V.

Melendez also challenges the trial court's admission of the testimony of Detective Flores, who testified that she showed Moises a single photograph that included Melendez (among a larger group of people) and that Moises identified Melendez from that photograph. At trial, while Moises provided inconsistent testimony about whether he had met Melendez prior to the day of the murder, Keila testified that he "of course" had met Melendez before that day, and the trial court expressly credited her testimony on the issue. The trial court also viewed the entire photographic identification procedure between Moises and Flores on videotape and determined that Flores' testimony was admissible. Melendez claims that the single-photograph identification, as opposed to a photo-array identification, was unreliable and unduly suggestive.

Under the circumstances, we are confident that Moises' identification of Melendez from a single photograph was proper and that Flores' testimony regarding that identification was admissible. Our general two-step inquiry under *Adams v. United States*, 883 A.2d 76, 81 (D.C.2005), governing the admissibility of out-of-court photographic identifications is unnecessary where, as here, "there is no possibility of police suggestion or witness misidentification," *id.*, because "the person to whom the photograph is shown is an eyewitness to a crime who has already given police the name of the criminal—a relative, neighbor, or close acquaintance." *Green v. United States*, 580 A.2d 1325, 1326 (D.C.1990). We have "routinely upheld the practice of showing a witness a single photograph of a personal acquaintance or of someone upon whom the witness had a full opportunity to focus during the commission of a crime." *Id.* at 1327. Here, Moises was an eyewitness to the murder and had already given Bradshaw the name of Melendez, who was Moises' neighbor. Moises was both a personal acquaintance of Melendez and also had the opportunity to focus on Melendez before, during, and after Margot's murder, particularly during the presumably hour-long ride from the District to Baltimore. The trial court expressly credited Keila's testimony that Moises was familiar with Melendez prior to the day of the murder, holding that "[Keila's] testimony about the many times that … Moises had seen Carlos come into contact with him" before the day of the murder "is more reliable testimony" than Moises'. Based on these facts, we are satisfied that the admission of Moises' out-of-court photographic identification of Melendez was not in error.

## VI.

Melendez's final two issues arise from the trial court's response to the in-

consistent verdicts with regard to the charge of second-degree murder. The jury both acquitted and convicted Melendez of that charge, finding him guilty of second-degree murder as the lesser-included offense of first-degree murder but not guilty of second-degree murder as the lesser-included offense of felony murder. Melendez asserts that even in the absence of any objection by his trial counsel, the trial court was under an obligation to act *sua sponte* to "clear up the confusion before recording the verdicts." We disagree.

We addressed this precise situation in *Fisher v. United States,* 749 A.2d 710 (D.C.2000), in which the defendant was acquitted of second-degree murder as a lesser-included offense of first-degree premeditated murder but was convicted of second-degree murder as a lesser-included offense of first-degree felony murder. Relying on long-standing Supreme Court precedent,[2] we held in *Fisher* that a defendant "no more may argue that the acquittal of second-degree murder (rather than the conviction) was the one the jury 'really meant' than the government may argue the opposite." *Id.* at 714 (citing *Powell, supra,* 469 U.S. at 68, 105 S.Ct. 471). Thus, "the course required of us is simply to insulate the jury's verdict from review on the ground of inconsistency." *Id.* (citing *Powell, supra,* 469 U.S. at 69, 105 S.Ct. 471). Even were we to disagree with the reasoning of that opinion, we are constrained as a panel to follow its conclusion here and deny Melendez relief on this claim. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

Because under *Fisher* the trial court committed no error in its response to the inconsistent verdicts, Melendez's final claim—that his trial counsel was constitutionally deficient for failing to react to the inconsistent verdicts—is without merit. *See Artis v. United States,* 802 A.2d 959, 973 (D.C.2002) (holding that trial counsel was not ineffective in failing to take particular actions because there was "no legitimate basis" upon which to challenge that trial counsel's performance was "constitutionally deficient").

## VII.

For the foregoing reasons, all of Melendez's claims on appeal fail, and we affirm the trial court's decision.

*Affirmed.*

---

**2.** *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932).